554 So.2d 695 (1989)
Mark K. ANDERSON and Kellogg-Moore Oil Company, Inc.
v.
Wallace E. HECK, Sr.
Consolidated with
HOWARD GRIFFIN DISTRIBUTORS, INC.
v.
H.G. DISTRIBUTORS, INC.
Nos. 88 CA 0782, 88 CA 0783.
Court of Appeal of Louisiana, First Circuit.
November 15, 1989.
Rehearing Denied January 9, 1990.
Writ Denied March 30, 1990.
*697 Sam J. D'Amico, Baton Rouge, for plaintiffs-appellees in No. 88 CA 0782.
Dawn Barrios, New Orleans, for defendants-appellants in Nos. 88 CA 0782 and 88 CA 0783.
Herschel C. Adcock, Baton Rouge, for plaintiff-appellee Howard Griffin Distributors, Inc.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
This is a suit to collect the purchase price of a sale of all of the capital stock of a corporation pursuant to a buy-sell agreement. This suit is consolidated with a suit on two promissory notes. A threshold issue involves the effect of the trial court's ruling on the sequestration of witnesses. More significant issues pose questions of the applicability vel non of the Louisiana Securities Law (LSA-R.S. 51:701 et seq.), the Louisiana Unfair Trade Practices Act & Consumer Protection Law (LSA-R.S. 51:1401 et seq.), and the jurisprudential rules pertaining to the doctrine of negligent misrepresentation. We are also called upon to determine what setoffs, if any, the purchaser and the obligors on the notes are entitled to claim, and to determine if the trial court's calculation of setoffs is in error.
The sellers-appellees, Mark K. Anderson and Kellogg-Moore Oil Co., Inc., originally brought suit number 273,702 against the purchaser-appellant, Wallace E. Heck, Sr., to enforce a contract to purchase the stock of a closely held corporation, H.G. Distributors, Inc. Presently, the parties are in agreement that Mr. Heck, Sr. actually owns the stock, although no formal closing has taken place, nor stock certificates delivered. Thus, the real contest is over the payment of the purchase price and the correct amount thereof.
In defense, the purchaser claimed various setoffs of the purchase price because of numerous acts of the sellers which he characterized as breaches of the contract to buy and sell. He also reconvened, claiming damages and loss of profit for negligent misrepresentations.
A second suit, number 284,343, was filed against all of the parties to the first suit (plaintiff Mark K. Anderson, plaintiff Kellogg-Moore Oil Co., Inc., and defendant Wallace E. Heck, Sr.) as well as the corporation which was the object of the buy-sell agreement, appellant H.G. Distributors, Inc. The plaintiff in the second suit was appellee Howard Griffin Distributors, Inc. The second suit alleged default on two promissory notes owed by H.G. Distributors, Inc. and guaranteed by the other named defendants.
H.G. Distributors, Inc. reconvened, claiming that a portion of the debt evidenced by the two notes was owed by Howard Griffin Distributors, Inc. to itself. The suits were consolidated and tried on the merits.
In suit number 273,702 the trial court found that Mr. Heck, Sr. was obligated for the purchase price of the corporate stock, less certain setoffs. In suit number 284,343 judgment on the notes was rendered against all named defendants, in solido, but the judgment recognized the right of Mark K. Anderson and Kellogg-Moore Oil Co., Inc. to be indemnified by their co-defendants, Wallace E. Heck, Sr. and H.G. Distributors, Inc.
*698 The trial judge has provided us with thorough reasons for judgment from which we can extract the history of the various corporations involved. Our own review of the testimony concerning the dealings between the buyer and the sellers assures us that for the most part the trial judge was correct in his factual findings. The portions of the judgment we find necessary to amend are those portions evidencing errors in calculation of the setoffs.

CORPORATE HISTORY
1977: Howard Griffin Distributors, Inc. was incorporated. The corporation was the franchise distributor for Ariens Corporation (manufacturer of the Ariens lawnmower) and Outboard Marine Corporation (manufacturer of Lawnboy products.)
1980: Howard Griffin Distributors, Inc. sold its distributor business to a new corporation, H.G. Distributors, Inc., whose stockholders were Larry W. McDonald, Bennie J. Evans, and Central Oil & Supply Corporation. The vendee corporation executed two promissory notes: the first dated October 13, 1980, for $76,207.71; the second dated October 21, 1980, for $82,154.87. Both notes were endorsed and guaranteed by the above named stockholders.
1982: The original stockholders of H.G. Distributors, Inc., sold all of their stock to Mark Anderson and Kellogg-Moore Oil Company, on September 1. With the concurrence of Howard Griffin Distributors, Inc., the new stockholders substituted themselves as sureties on the two notes. However, Larry W. McDonald continued his employment with H.G. Distributors, Inc., as its president.
1983: After the sale of H.G. Distributors, Inc., during the previous year and before March 1, negotiations for the purchase of the business were initiated by Baton Rouge businessman Wallace E. Heck, Sr. The negotiations included several trips to the distributor's office and warehouse in Monroe, Louisiana, by Mr. Heck, his son, and an employee, Robert Lewis. On March 1, a contract to buy and sell corporate stock and an addendum to the contract were executed by the parties.
March 1983: Mr. Heck, Sr. commenced management of H.G. Distributors, Inc. He moved the business operation to Baton Rouge, Louisiana, and he made some payments of liabilities he had assumed in the buy-sell agreement. Mr. McDonald continued his employment with the company under the new owner.
September 30, 1983: The purchase price of $300,000.00 became due. Although a formal closing of the sale was scheduled to take place in Monroe, Louisiana, it did not. Approximately three months later, the instant law suits were filed.

SEQUESTRATION OF WALLACE HECK, JR.
Purchaser, Wallace Heck, Sr., alleges trial court error in not exempting Wallace Heck, Jr. from its sequestration order, because he was a duly designated corporate representative and/or an interpretor for Mr. Heck, Sr. However, appellant has failed to specify how avoidance of this error would have altered the outcome of the case.
During the first day of trial, counsel for Mr. Heck, Sr. informed the trial court that Mr. Heck, Sr. had a hearing disorder and requested that his son, Wallace Heck, Jr., a fact witness, be exempted from the court's sequestration order in an effort to communicate with his father regarding the events of the trial. The trial court refused this request. Thereafter counsel requested Wallace Heck, Jr.'s presence in the court as the representative for H.G. Distributors, Inc. Again the court denied the request. On the fourth day of trial, Ms. Grace Tate, a certified hearing audiologist, testified as to Mr. Heck, Sr.'s hearing deficiency. Thereafter the court permitted Raymond Heck, another son of Mr. Heck, Sr. who was not a witness, to assist his father in understanding the proceedings.
Louisiana Code of Civil Procedure article 1631 provides:
The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious *699 manner, and to control the proceedings at the trial, so that justice is done.
On its own motion the court may, and on request of a party the court shall, order that the witnesses, other than parties, be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interest of justice, the court may exempt any witness from its order.
(Amended by Acts 1988, No. 515, § 2.)
As mandated by article 1631 above, the trial court shall use its discretion in determining which witnesses shall be exempted from its sequestration order. Considering the conflicting factual claims of the parties and the fact that Mr. Heck, Jr. was a primary fact witness, we find that the trial court did not abuse its discretion. Even assuming an abuse of discretion in not permitting Mr. Heck, Jr. to remain in the courtroom during the proceedings, we find that it was harmless error which did not prejudice either Wallace Heck, Sr. or H.G. Distributors, Inc. Mr. Heck, Sr. was provided an interpretor as soon as the court was presented with evidence of his hearing impairment and as such Mr. Heck, Sr. was a competent representative for H.G. Distributors, Inc. Moreover, a review of the testimony of Mr. Heck, Sr. convinces us that he understood the proceedings and was capable of assisting his counsel both as a defendant and as a representative for H.G. Distributors, Inc.

LOUISIANA BLUE SKY LAW
Purchaser contends that the facts as pled and proved establish a violation of the Louisiana Blue Sky Law, specifically LSA-R.S. 51:715 A(3).[1] (Amended and Reenacted 1985, No. 722, § 1 as Louisiana Securities Law.) (See now LSA-R.S. 51:714 A.). Former Section 715 A(3) provided for civil liability when any person "[o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission...." The statute provides substantial penalties.
Application of the Louisiana Blue Sky Law in the instant case raises the res nova issue of whether a transaction involving an exempt[2] private sale of all of the stock of a closely held corporation to a purchaser who personally undertakes the operation and management of the corporate business is a "security transaction" subject to the antifraud provisions (Former LSA-R.S. 51:715) of the Louisiana Securities Law. An analysis of the transaction in the instant case reveals that 100% of the stock of a closely held corporation was sold to the purchaser and that the purchaser took over 100% control and management of the corporation. A lengthy contract (including numerous warranties) was negotiated between the parties, who we find to be of relatively equal bargaining power. Each party was represented by an attorney and had ample opportunity to protect his interests.
*700 Although the word "stock" is expressly used in the statutory definition of "security,"[3] we do not believe that the legislature intended the statute to cover the factual situation presented by the case sub judice, wherein the stock was sold to transfer 100% of the interest in a closely held corporation. Our reasons are three-fold. First, the transaction was in economic reality a sale of the assets of a business; it was merely structured as the sale of stock. Second, the parties were quite free and had ample opportunity to examine the financial statements, supporting records, assets, and other matters relating to the business enterprise. Third, the success or failure of the business and consequently the worth of the stock was dependent upon the efforts of the purchaser and not a third party. For these reasons we are convinced that the stock which was used to transfer ownership of H.G. Distributors, Inc. merely transferred that on-going business's assets. There was no "security transaction" within the purview of the Louisiana Blue Sky Law.[4]
We are aware of the United States Supreme Court's decisions of Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), and Gould v. Ruefenacht, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), wherein the court interpreted similar provisions of the Federal Securities Laws. Although the definition of "security" in the Federal statute is almost identical to the definition adopted by Louisiana, we decline to follow the literalist approach taken by the court. Instead, we adopt the view taken by Justice Stevens in his dissent where he stated: "I believe that Congress wanted to protect investors who do not have access to inside information and who are not in a position to protect themselves from fraud by obtaining appropriate contractual warranties." Landreth, 471 U.S. at 698, 105 S.Ct. at 2312. We further note that, unlike the purchaser in Landreth, Mr. Heck was given 100 percent control over H.G. Distributors, Inc. as well as complete control over the management of the corporation.[5]

CLAIMS FOR BREACH OF CONTRACT AND NEGLIGENT MISREPRESENTATION
The purchaser's remaining assignments of error focus primarily on the trial court's findings of fact and the trial court's failure to grant relief under rules of law pertaining to breach of contract and the tort of negligent misrepresentation. Purchaser contends that the sellers breached the Contract to Buy and Sell Corporate Stock because they failed to make full and complete disclosures concerning the financial condition of H.G. Distributors, Inc. Furthermore, he argues that the failure to fully disclose the financial and corporate condition of H.G. Distributors, Inc. prior to the execution of the Contract to Buy and Sell Corporate Stock, under the circumstances, also constitutes an unfair act or practice *701 within the meaning of LSA-R.S. 51:1405, thus entitling purchaser to attorneys fees.
A complete review of the record and exhibits in this case reveals the following facts with regard to this somewhat unusual business transaction which we will set forth in narrative form.
In September of 1982, when Mark Anderson and James Moore, Jr. purchased 100% of the stock of H.G. Distributors, Inc., a corporation primarily engaged in the wholesale distribution of lawnmowers and heaters, neither buyer had previous experience in that type of distributorship. They retained one of the previous owners of the corporation, Larry W. McDonald, as the corporation's new president and general manager. Six months later Anderson and Moore were contacted by a representative of Mr. Heck, Sr. concerning the purchase of their distributorship. Previous to contacting Anderson and Moore, Mr. Heck had been actively seeking a lawnmower franchise from Ariens to start his own distributorship. An Ariens representative informed Mr. Heck that the exclusive franchisee for Ariens in Louisiana was H.G. Distributors, Inc., thus prompting Mr. Heck's inquiry into the purchase of H.G. Distributors, Inc. Sometime during January 1983, Anderson and Moore had their first meeting with Mr. Heck to discuss the possible purchase of H.G. Distributors, Inc. On this occasion Mr. Heck was supplied a set of the latest audited financial statements of the corporation dated August 31, 1982. Subsequently, Mr. Heck had between four to six meetings with Mr. Anderson and Mr. Moore, including two visits to Monroe to examine the offices and warehouse of H.G. Distributors, Inc. The sellers testified that during the visits the purchaser had access to any information he desired and that all company employees were told to cooperate fully with the purchaser. However, Mr. Heck, Sr. testified that he was rushed through the examination and told by the sellers that they did not want their employees to know that they were contemplating a sale of the business. Although the purchaser repeatedly stated that he had made a mistake in relying upon the information given by Mr. Anderson and Mr. Moore, he admitted that he did not attempt to verify information concerning the type of inventory in stock, the market for lawnmowers or heaters, the validity of the accounts receivable, or the substance of the financial statements. Nor did he contact Lawnboy or Ariens concerning quota requirements.
Wallace Heck, Jr. testified that prior to the sale they received an audited statement and a current balance sheet. He stated that they did not received a dealer list or an accounts receivable list, but instead were told by Anderson that H.G. Distributors, Inc. had approximately 150 to 200 dealers and that the accounts receivable were good.
Robert Lewis, an employee of Mr. Heck, who accompanied him on the examination, testified that he and Mr. Heck went to Monroe on a Saturday morning and that Mr. Anderson showed them around. They received two audited financial statements as of August 31, 1982, and the individual monthly statements since August. He further testified that they made a second visit and were not refused any requested documents. Mr. Lewis testified that he recommended purchasing the business based upon the financial statements.
Notwithstanding the alleged refusal of the sellers to permit examination of the business records, Mr. Heck signed a Contract to Buy and Sell Corporate Stock in which he personally assumed over one million dollars of debt, and agreed to assume the responsibility for the payment of all liabilities of the corporation, as well as the control and management of the corporation from March 1, 1983, until the closing.[6] Purchaser was given seven days to personally assume the corporate debts and have Mr. Anderson and Mr. Moore released from all liability of H.G. Distributors, Inc. to *702 Central Bank and Ouachita National Bank, which liability represented the majority of H.G.'s debts. Prior to signing the contract, an addendum was attached which made the purchase price of the stock contingent upon the corporation not being denied renewals of the two major lawnmower franchises by September 30, 1983, the scheduled date of the closing of the sale.
On March 1, 1983, purchaser assumed control of the corporation and within a month's time became aware of the following information. (1) The inventory contained approximately nine times the amount of heaters represented by sellers. (2) Purchaser became aware of the return of $28,000.00 in heaters which the prior owners had agreed to accept, provided the returnee purchased twice the amount returned in lawnmower equipment. (3) Purchaser received the February financial statement which stated a $78,000.00 loss. (4) Purchaser became aware of problems existing between the previous owners and Lawnboy representatives, with regard to cancellation of the franchise. (5) Purchaser discovered several bad accounts receivable. (6) Purchaser discovered that the dealer list contained names of dealers who were no longer doing business. We note that much of this information was known by purchaser, or could have been discovered by purchaser, before the lapse of the seven day period in which he had to assume the $1,000,000 in corporate debts. Notwithstanding this information, purchaser moved the corporation lock, stock and barrel to Baton Rouge, Louisiana, where he ran the corporation.
Soon after purchaser took control of the corporation, Lawnboy and Ariens agreed to continue the 1983 franchise agreements with H.G. Distributors, Inc. In July 1983, Ariens renewed its franchise agreement with H.G. Distributors, Inc., however, Lawnboy neither renewed nor expressly denied the Lawnboy renewal. It was not until February of 1984 that H.G. Distributors, Inc. received the Lawnboy renewal which was subsequently cancelled in April of 1984 for failure to meet quota requirements.
The parties never formally closed the sale and on December 29, 1983, Mark Anderson and Kellogg-Moore Oil Company filed suit for the $300,000 owing for the stock. The purchaser continued to run the corporation until it ceased business operations in 1986.
As set forth above, the trial court found purchaser liable for the $300,000 purchase price, less certain setoffs. The trial court concluded that the Lawnboy and Ariens franchises were not denied and therefore, pursuant to the contract addendum, purchaser owed sellers $300,000. However, purchaser was awarded a credit totalling $26,344.66 for bad accounts receivable, inventory shortages and unpaid taxes. With the exception of the alleged violations of the Louisiana Securities Law and Unfair Practices Act, the trial court addressed all of the purchaser's contentions which he now brings on appeal. We therefore append the entire Reasons for Judgment.
After reviewing the record we are plagued, as apparently was the trial court, by the purchaser's unexplained and virtually blind reliance upon the alleged verbal representations of the two sellers. This reliance becomes more puzzling when it is considered that the sellers owned the business less than six months, and apparently had no previous experience in this type of business whereas the purchaser owned several businesses and could be considered a successful entrepreneur. The purchaser attempted to protect himself from the risks of this business transaction by requiring numerous warranties in the contract to purchase, yet after discovering virtually all of the alleged breaches of contract and misrepresentations within weeks of the acquisition, he did nothing to cancel the sale. Compare Haacker v. Keeth, 378 So.2d 969 (La.App. 3d Cir.1979) and Calhoun v. American Marine Corporation, 159 So.2d 19 (La.App. 4th Cir.1963), writ refused, 245 La. 951, 162 So.2d 9 (1964). Furthermore, the contract addendum specifically provided that "Purchaser shall have the authority to manage the business of H.G. Distributors, Inc. as General Manager from March 1, 1983 through the closing date, or until such time as Purchaser gives notice to the *703 Sellers that they will not perform their obligations hereunder due to an uncorrected breach of warranty on the part of Sellers." (Emphasis added.) The purchaser failed to notify the sellers of any breaches of warranty, or of the fact that he did not want to close the sale or pay the $300,000 purchase price. The purchaser explained his actions by stating that he thought he could make a go of the business notwithstanding the alleged breaches of warranty and misrepresentations.
Underlying the entire rationale of the trial court's reasons is the ultimate factual conclusion that Mr. Heck, Sr. did not justifiably rely on the representations of the sellers. The lack of justifiable reliance can be fatal to either a cause of action in contract or tort. See Calhoun, 159 So.2d 19 and Dousson v. South Central Bell, 429 So.2d 466 (La.App. 4th Cir.), writ not considered, 437 So.2d 1135 (La.1983). Ever mindful of this underlying premise we now address the individual assignments of error.

BREACH OF EXPRESS WARRANTY
Purchaser contends that the trial court erred when it concluded that the sellers did not breach paragraph 4.(h) of the Contract to Buy and Sell Corporate stock. Purchaser asserts that the $78,842.34 loss in February 1983 was a materially adverse change in H.G. Distributor, Inc.'s financial condition. Paragraph 4.(h) provides:

Absence of certain changes or events. Since January 31, 1983, there has not been any change in H.G.'s financial condition, assets, liabilities or business other than changes in the ordinary course of business, none of which have been materially adverse. (Emphasis supplied.)
To establish a breach of warranty under paragraph 4.(h) purchaser was required to prove: (1) a change in financial condition, assets, liabilities or business, (2) not in the ordinary course of business, (3) which was materially adverse. Furthermore, "[a] party who unreasonably delays asserting his rights under the warranties of a contract is estopped to prove alleged inaccuracies. In any event, such party bears the burden of proof." Calhoun, 159 So.2d at 22. (Citations omitted.)
Considering the expert testimony of Mr. Soileau and the inaction of purchaser after discovering the $78,842.34 loss for the month of February 1983, only 15 days after the signing of the contract on March 1, 1983, the trial court found no breach of contract.
The trial court has great discretion in accepting or rejecting expert testimony and such determinations should not be disturbed absent manifest error. Orgeron v. Dobkowski, 476 So.2d 458 (La. App. 1st Cir.1985). We find that the expert testimony supports the trial court's conclusion, with the exception of an admitted mistake in journal entries regarding accrued interest expense for the month of February 1983. Sellers' expert, Mr. Soileau explained that the February statement contained a reversing entry for interest which should have been accrued in January. The February entry for interest expense was overstated by $5,036.00 in order to correct an accounting error in January. We find that this type of mistake was covered by another warranty in the sellers' contract. Sellers expressly warranted in paragraph 4.(g) that the financial statements fairly represent the financial condition of H.G. Distributors, Inc. The financial statements overstated the value of the business by $5,036.00, thus purchaser is entitled to a credit for that amount. We amend the trial court judgment to award purchaser a credit of $5,036.00.

RENEWAL OF FRANCHISES
Purchaser alleges trial court error in finding that he was not entitled to a $150,000.00 reduction in the sales price for the denial of the Outboard Marine Corporation (Lawnboy) franchise. The contract addendum of March 1, 1983, provided in part:
Seller and Purchaser agree that they will individually and collectively exert their best efforts toward obtaining renewals of existing distributing agreements and that neither will do anything detrimental to obtaining such renewals.

*704 In the event Purchaser uses his best efforts to obtain renewals of the distributorship agreements mentioned hereinabove but such original renewal or renewals are denied by Ariens Corporation or Outboard Marine Corporation on or before September 30, 1983, then the sales price shall be reduced by the sum of ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) DOLLARS for each distributorship not obtained.
The trial court denied the reduction based on the specific language of the contract which provides that the purchase price shall be reduced by $150,000.00 if either distributorship renewal is denied on or before September 30, 1983. Based on purchaser's testimony, that Lawnboy representatives never specifically denied the franchise renewal, the court concluded that the contract was not breached. We find no error with the trial court's ruling in this regard, specifically noting the testimony of Wallace Heck, Jr., which revealed that prior to executing the renewal, Lawnboy requested Wallace Heck, Sr. to execute a new guaranty form which Mr. Heck refused. Mr. Heck, Jr. further testified that the failure of Lawnboy to deliver equipment after September 30, 1983, was "due to technical problems." This testimony leads us to believe that active negotiations continued from September 30, 1983, until the franchise was actually renewed in February of 1984, and that the failure to timely renew was at least partly due to the purchaser's unwillingness to cooperate with Lawnboy. We find no error in this ruling of the trial court.

DAMAGES FOR HEATER RETURNS
This assignment of error alleges that the trial court erred in finding that the evidence did not disclose the loss suffered by H.G. Distributors, Inc. for the return of heaters by K & D Rental and C & D Rental pursuant to an alleged agreement between the dealers and the sellers.
Mr. Heck contends that prior to his acquisition, the sellers agreed to accept the return of kerosene heaters which were previously sold to K & D Rental and C & D Rental, provided that the dealers would purchase $2.00 of lawn equipment for every $1.00 of heaters returned. Mr. Heck asserts that these agreements were not disclosed to him prior to his acquisition, and that this non-disclosure constituted a misrepresentation.
Without determining whether the non-disclosure constituted a misrepresentation the trial court concluded that purchaser did not carry his burden of proof in showing H.G. Distributor, Inc.'s loss.
A plaintiff bears the burden of establishing with a legal certainty each and every element of damage claimed. Woodfield v. Dugas, 450 So.2d 1011 (La.App. 1st Cir.1984). This burden must be borne by competent evidence showing the extent of the damage and a party's own uncorroborated personal estimate of the value of the loss is insufficient. Freeman v. G.T.S. Corp., 363 So.2d 1247 (La.App. 4th Cir. 1978). See also Richard v. Tri-J Indus. Const., Inc., 478 So.2d 215 (La.App. 3d Cir.1985), and Saulter v. Cousin, 294 So.2d 251 (La.App. 1st Cir.1974).
Mr. Heck contends that his testimony to the effect that H.G. Distributors, Inc. sold the returned heaters for approximately one-third of their original cost, together with his testimony that one of the dealers purchased merely one-half of the amount of merchandise that was intended to be sold upon return, is sufficient evidence to establish the loss suffered.[7] We disagree. Mr. Heck offered no invoices showing sales to K & D Rental nor to C & D Rental, nor did he offer any evidence of the amount for which he actually sold the heaters. Assuming these transactions took place, common *705 sense dictates that some type of documentation must have been made. Mr. Heck testified that the heaters were paid for by check; however, the checks were never entered into evidence. It was Mr. Heck's burden to bring forth such competent evidence to establish his loss. He failed to do so, thus failing to carry his burden by a preponderance of the evidence. We thus find no error in the trial court's ruling.

TRANSFER OF HEATERS
Purchaser alleges trial court error in failing to find that the sellers misrepresented the business when they failed to inform Mr. Heck of inventory transfers at little or no profit to the company.
Mr. Heck contends that the sellers' failure to inform him of the transfers misled him as to the gross volume of business conducted by H.G. Distributors, Inc. Mr. Heck explained that he was told that inventory was marked up approximately 28% before it was sold. He therefore assumed that the company made a 28% gross profit on all the inventory which passed through the business. In fact, the company was unable to sell some of the inventory and decided to transfer it to other franchisees. Purchaser contends that the failure to inform him of the transfers was a negligent misrepresentation of the sellers.
The language of our brethern of the Fourth Circuit is pertinent here.
Louisiana jurisprudence has recognized that the common law tort of negligent misrepresentation is encompassed within the broad language of C.C. Articles 2315 and 2316. Devore v. Hobart Mfg. Co., 367 So.2d 836 (La.1979); Hoffman v. Sabre Marine, Inc., 407 So.2d 516 (La.App. 4th Cir.1981). Our courts have adopted the definition of negligent misrepresentation set forth in the Restatement (2nd) of Torts which states, at Section 552:
'(1) One who, in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transaction, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'
Dousson v. South Central Bell, 429 So.2d at 468.
For purchaser to prevail under this theory it must first be established that the sellers owed a legal duty to him to provide correct information when he sought to purchase their business. Next it must be established that the sellers had a pecuniary interest in the transaction. This interest need not be direct or immediate. "The fact that the information is given in the course of the defendant's [sellers'] business, profession, or employment is a sufficient indication that he has a pecuniary interest in it even though he receives no consideration for it at the time." Restatement (2nd) Torts, Section 522, comment d. Finally, purchaser must establish justifiable detrimental reliance on the sellers' misrepresentations in his purchase of the business.
Under the facts presented, it is clear that the sellers owed a legal duty to provide correct information to purchaser, and that the sellers had a pecuniary interest in the transaction. Furthermore, it is not disputed that Mr. Heck may have misunderstood what the gross volume of the business was. However, we find that the purchaser's misunderstanding was a result of his unexpressed assumption that all the inventory which passed through the business was ultimately sold to retail dealers at a 28% markup; it was not a result of any negligence on the part of the sellers. We find particularly persuasive the fact that all of the experts testified that the transfers did not affect the gross sales figures nor the gross profit figures which were given to Mr. Heck.
Based on these facts, we find the purchaser's reliance upon the sellers' omission to inform him of the inventory transfers unjustifiable. In light of the available information we find it unreasonable for purchaser to have relied on only one aspect of the financial statement when the sellers *706 provided a complete statement which accurately represented the corporate transactions. Purchaser failed to establish all of the elements of negligent misrepresentation. We find no error in the trial court's ruling.

UNPAID TAXES
Mr. Heck alleges trial court error in finding that he was not entitled to a setoff or reduction in the purchase price for payment made for the taxes of H.G. Distributors, Inc. for 1983.
Mr. Heck alleges that the Contract to Buy and Sell Corporate Stock provided as follows: "... Purchaser shall also assume the responsibility for payment of all liabilities and obligations of H.G. incurred following the execution of this agreement." (Emphasis added).
Mr. Heck claims that he paid taxes of $16,700.40 for the 1983 tax year, which taxes were incurred prior to the date of the contract. As support for this proposition he cites LSA-R.S. 47:1952 A, which provides:
A. All property subject to taxation, including merchandise or stock in trade, shall be placed upon the assessment lists in the respective parishes or districts where situated. Assessments shall be made on the basis of the condition of things existing on the first day of January of each year, however, as to the ownership of immovable property subject to taxation, the assessor may note on the tax roll any transfer of such property which takes place after the first day of January but before the assessor files the tax roll with the tax collector as required in R.S. 47:1993, if practicable. If the assessor makes such note on the tax rolls, the tax notice shall then be sent to such owner in lieu of the owner of the property as of January first. (Emphasis added.)
Mr. Heck's argument is also supported jurisprudentially in Louisiana Oil Refining Co. v. Louisiana Tax Comm'n, 167 La. 605, 120 So. 23 (1929), wherein the Supreme Court found that the owner of personal property on January 1st is liable for taxes for the entire year since the law contemplates that assessments shall be made on the basis of the condition of things as they existed on January 1st of the year in which the assessments are made. The court went on to state that "if he who was owner of the property on January 1st be liable for the taxes for that year, then certainly he cannot relieve himself of that liability by selling the property before the assessment rolls have been completed." Id. 120 So. at 23.
The sellers contend that while ad valorem tax assessment valuation is made on property as of January 1st of the tax year, the law is clear that the taxes are not payable until December of the tax year. LSA-R.S. 47:2101(A) 1.
The question then becomes when are the taxes incurred? Based on the decision in Louisiana Oil Refining Co., supra, we find that the taxes are incurred as of January 1st of the year in which the assessment is made, notwithstanding the fact that payment is not due until December of the tax year. Although the owner as of January 1st may not avoid his liability for payment by selling the property prior to assessment, he may certainly adjust his selling price to reflect his tax liability.
The sellers also contend that the taxes were paid by the corporation, not Mr. Heck, and he is therefore barred from recovering these sums. But for the contract provision set forth above, we would agree with the sellers' contention in this respect. However, the contract expressly provides that the purchaser would assume the responsibility for payment of all liabilities and obligations of H.G. Distributors, Inc. incurred following the execution of the agreement. The negative inference to this provision is that the purchaser would not be liable for liabilities of H.G. Distributors, Inc. incurred prior to the agreement. The sellers in effect warranted the payment of all liabilities incurred by the corporation prior to the agreement. It matters not that Mr. Heck did not pay the taxes personally because the sellers warranted to Mr. Heck that the corporation would not have to pay any debts incurred prior to the execution of *707 the contract. We conclude that the 1983 taxes were incurred by the corporation on January 1st of 1983, and that these amounts were not disclosed to Mr. Heck prior to the sale. We acknowledge the fact that Mr. Heck assumed responsibility for the payment of other liabilities which were incurred by the corporation prior to the contract. However, these liabilities were disclosed to him and he expressly contracted to assume these liabilities. We amend the trial court judgment to award the purchaser a credit of $23,045.06.

MISSTATEMENT OF DEALERS
This assignment alleges trial court error in finding that the sellers did not misrepresent the number of dealers of H.G. Distributors, Inc. to Mr. Heck. The trial court made the following findings in this regard:
Mr. Heck alleges that the number of dealers was misrepresented to him. According to Mr. Heck, he was supplied a list of dealers and after acquiring H.D. [sic] Distributors, Inc., he checked some and found they were out of business.
The evidence does not reflect that Mr. Moore made any representation as to the volume of sales one could expect from the individual dealers. Again, we have information disclosed to Mr. Heck prior to March 1, 1983, which he took no steps whatsoever to verify as to what volume the individual dealers were ordering from H.D. [sic] Distributors, Inc.
We find no error in the trial court's ruling.

RECONVENTIONAL DEMAND AND UNFAIR TRADE PRACTICES CLAIM
Mr. Heck alleges trial court error in not awarding him damages for the items listed in Paragraph XII(e) (loss future profits) and (g) (loss of profits for loss of Lawnboy franchise) of his reconventional demand. The trial court denied recovery for these damages, finding that they were damages suffered by the corporation, not Mr. Heck, and thus he could not recover for these damages. The court cited Hinchman v. Oubre, 445 So.2d 1313 (La.App. 5th Cir.1984).
Mr. Heck contends that his claim for damages is based on breach of contract and not redhibition. He asserts that based on the representations and warranties made by the sellers, he infused over $1,000,000.00 into H.G. Distributors, Inc.
In order for purchaser to recover under a breach of warranty theory he must establish that the contract warranted the alleged loss of future profits.
We are unable to find any warranty made to purchaser concerning future profits of the corporation. Therefore, we find no breach of contract in this regard.
Mr. Heck also alleges that the failure to fully disclose the financial and corporate condition of H.G. Distributors, Inc. prior to the execution of the contract constitutes an unfair act or practice within the meaning of LSA-R.S. 51:1405 (Unfair Trade Practices and Consumer Protection Law), entitling him to damages and attorney's fees.
As set forth in the previous assignments of error, we have concluded that the actions of the sellers were not deceptive; nor were they unfair. Consequently, purchaser's claim for recovery under the Unfair Trade Practices and Consumer Protection Law has no merit.

ACCOUNTS RECEIVABLES
Purchaser contends that the trial court erred in fixing the amount of the accounts receivable not received by purchaser at $9,000.00. Purchaser argues that the trial court clearly held that purchaser was the owner of one-half of the balance of $30,007.23 in accounts receivable, or $15,003.61. The court valued the accounts at $9,000.00 because the judge concluded that "[a]ccounts receivable are usually of less value as the delinquency increases." Purchaser argues that the trial court erred when it sua sponte arbitrarily reduced the value of the accounts receivable by 40%. We agree. There is no evidence in the record supporting the trial judge's conclusion. We therefore vacate the trial court's *708 award of $9,000.00, and award appellant a credit of $15,003.61.[8]

SUIT NUMBER 284,343

SETOFF FOR DEBTS OWED BY HOWARD GRIFFIN, INC.
H.G. Distributors, Inc. contends that it is entitled to a $36,423.52 setoff on the remaining balance of the October 21, 1980 note for merchandise it sold to Howard Griffin, Inc. on open account. Alternatively, H.G. Distributors, Inc. claims that Mr. Howard Griffin is liable for the debt pursuant to a guaranty signed by Mr. Griffin on behalf of Howard Griffin, Inc.[9] Howard Griffin, Inc. contends that the entity which purchased goods on open account with H.G. Distributors, Inc. was Howard Griffin Retail, Inc. and not Howard Griffin, Inc.
This issue involves the factual determination of which entity actually had the open account with H.G. Distributors, Inc. and whether H.G. Distributors, Inc. knew or should have known which entity it was.
The October 21, 1980 note contained a provision for setoff for debts owed by Howard Griffin Distributors, Inc. to H.G. Distributors, Inc. Furthermore, Mr. Griffin signed a continuing guaranty and indemnity agreement covering debts owed by Howard Griffin Distributors, Inc. to H.G. Distributors, Inc.
When purchaser bought H.G. Distributors, Inc., the open accounts were already set-up in the computer and appropriate guaranties were in the corporate files. Purchaser admits that he never checked the accounts for accuracy, nor sought to verify that the guaranties were still valid. Purchaser alleges that he was told by the sellers "not to worry about the amounts sold to Howard Griffin, Inc. because they could off-set those amounts on their note due to Howard Griffin Distributors, Inc. Purchaser alleges that he relied on this statement when he permitted the account balance of Howard Griffin, Inc. to exceed normal limits. He also alleges that he was unaware that the account was actually for Howard Griffin Retail, Inc., until he was formally sued on the promissory note on January 1, 1984. According to the evidence, the open account balance, for Howard Griffin, Inc., as of December 1983, exceeded the entire debt owed by H.G. Distributors, Inc., yet H.G. Distributors, Inc. paid the yearly installment on the note without any setoff.
It is undisputed that the merchandise sold under this particular account went to the entity of Howard Griffin Retail, Inc. Howard Griffin Retail, Inc. was a wholly owned subsidiary of Howard Griffin, Inc. until February of 1983, one month prior to the sale of H.G. Distributors, Inc. to purchaser, when James Plank purchased all ownership interest.[10]
Although the invoices and statements with regard to this account indicate the debtor to be Howard Griffin, Inc., neither Howard Griffin, Inc. nor Howard Griffin Distributors, Inc. ever received a billing statement or demand for payment. The evidence also reveals that from March 1983 until November 1984, hundreds of thousands of dollars of merchandise was sold to this account and that after May of 1983 the account balance remained in excess of $30,000.00.
The credit manager for Heck Industries, George Woolley, testified that he began working for H.G. Distributors, Inc. in September of 1983, and that H.G. Distributors, Inc. had three different Howard Griffin, Inc. accounts. This fact is verified by the billing statements entered into evidence which contain statements to Howard Griffin, *709 Inc., P.O. Box 1462, Monroe, LA 71201, under three different account numbers. Only account number XXXXX, the Howard Griffin Retail, Inc. account, had any substantial activity. In August of 1983 the billing address for account number XXXXX changed to P.O. Box 3088, Monroe, LA 71210. Mr. Woolley further testified that he knew that Jim Plank was in control of the business with which they had an active open account.
Based on these facts, we conclude that the amounts owed on account number XXXXX are not the debt of Howard Griffin, Inc., nor Mr. Griffin. The promissory note clearly provides a set-off for amounts owed by Howard Griffin Distributors, Inc., and the guaranty agreement signed by Mr. Griffin guaranteed only the debts of Howard Griffin, Inc. Furthermore, H.G. Distributors, Inc. knew or should have known that the entity which was purchasing large amounts of merchandise was in fact Howard Griffin Retail, Inc. Because neither Howard Griffin Distributors, Inc. nor Howard Griffin, Inc. owed any debts to H.G. Distributors, Inc. it is not entitled to any setoff. We affirm the trial court judgment in this regard.[11]
For the reasons set forth we amend the trial court judgment to award credits to Wallace E. Heck, Sr. as follows: The sum of $5,036.00 for the overstated interest expense on the February financial statement; the sum of $23,045.06 for unpaid taxes, and the sum of $15,003.61 for misstated accounts receivable. In all other respects the judgment of the trial court is affirmed. Costs to be paid by Mark K. Anderson and Kellogg-Moore Oil Company, Inc., appellees.
JUDGMENT AMENDED, AND AFFIRMED AS AMENDED.
ALFORD, J., concurs and assigns reasons.
APPENDIX

Suit Nos. 273,702 and 284,343 Division "I"

19th Judicial District Court

Parish of East Baton Rouge

State of Louisiana

Mark K. Anderson and Kellogg-Moore Oil Co., Inc.

vs.

Wallace E. Heck

Howard Griffin Distributors, Inc.

vs.

H.G. Distributors, Inc.

WRITTEN REASONS FOR JUDGMENT
In 1957 Howard Griffin incorporated Howard Griffin, Inc. Subsequently, in 1977, Howard Griffin Distributors, Inc. was incorporated. Also incorporated were Howard Griffin Wholesale Supply, Inc. and Howard Griffin Retail, Inc.
Howard Griffin Distributors, Inc. was the franchise distributor for Ariens Corporation, manufacturer of the Ariens lawnmower and Outboard Marine Corporation, manufacturer of Lawnboy products. In the fall of 1980, Howard Griffin Distributors, Inc. sold its distributor business to a new corporation, H.G. Distributors, Inc., whose stockholders were Larry W. McDonald, Bennie J. Evans, and Central Oil and Supply Corporation.
In connection with the sale by Howard Griffin Distributors, Inc. to H.G. Distributors, Inc., H.G. Distributors, Inc., executed two promissory notes, the first dated October 13, 1980, for $76,207.71 and the second on October 21, 1980, for $82,154.87. Both notes were endorsed and guaranteed by Larry W. McDonald, Bennie J. Evans and Central Oil and Supply Corporation.
On September 1, 1982, Larry W. McDonald, Bennie J. Evans and Central Oil and Supply Corporation sold their stock in *710 H.G. Distributors, Inc. to Mark Anderson and Kellogg-Moore Oil Company, who substituted themselves as sureties on the two notes executed by H.G. Distributors, Inc. to Howard Griffin Distributors, Inc. Howard Griffin Distributors, Inc. concurred with the substitution.
After the September 1, 1982 H. G. Distributors, Inc.'s stock sale, Larry W. McDonald continued his employment with H.G. Distributors, Inc., as its president. He testified that he received a phone call from Robert Lewis, an employee of Mr. Heck, about acquiring H.G. Distributors, Inc. Prior to Mr. Lewis' employment with Mr. Heck, he was a successful Snapper Lawnmower distributor in the Baton Rouge area. After the initial contact by Mr. Lewis, Mr. Heck, his son and Mr. Lewis visited H.G. Distributors, Inc.'s office and warehouse in Monroe, Louisiana to acquaint themselves with the operation of the business.
After some negotiations Mr. Heck decided to purchase the corporate stock of H.G. Distributors, Inc. from Mark K. Anderson and Kellogg-Moore Oil Company, Inc. A contract to buy and sell corporate stock and an addendum to the contract was executed on March 1, 1983, by the parties.
After the execution of the March 1, 1983, agreements, Mr. Heck commenced management of H.G. Distributors, Inc. as permitted in paragraph 2 of the addendum. He made some payments of liabilities assumed in paragraph 9 of the contract and moved the business operation to Baton Rouge, Louisiana. Mr. McDonald continued his employment with H.G. Distributors, Inc. after Hecks' acquisition.
The contract provided that Mr. Heck would pay $300,000.00 for the 500 shares of H.G. Distributors, Inc. stock owned by Mark K. Anderson and the 500 shares of H.G. Distributors, Inc. stock owned by Kellogg-Moore Oil Company, Inc. Payment would be due at the formal closing of September 30, 1983, at the law offices of Grant, Dean, Knapp, Laffey, Price & Dunn, 1105 Hudson Lane, Monroe, Louisiana, unless otherwise agreed to in writing by the purchaser and the sellers. Although no formal closing was ever confected, the parties agree that Mr. Heck is the owner of the 1000 shares of H.G. Distributors, Inc. stock; that the stock certificates have not been delivered; that the $300,000.00 has not been paid by Mr. Heck to Mark K. Anderson and Kellog-Moore Oil Company, Inc., and that Mr. Heck made the 1983 payments on the two notes owing to Howard Griffin Distributors, Inc., but no subsequent payments.
On December 29, 1983, Mark K. Anderson and Kellogg-Moore Oil Company, Inc. filed suit against Mr. Heck for the $300,000.00 owing for the stock. On January 3, 1985, Howard Griffin Distributors, Inc. filed suit against H.G. Distributors, Inc. on the two promissory notes. Amendments and incidental demands were subsequently filed in both suits.
The Court will first address the claims in Mark K. Anderson and Kellogg-Moore Oil Company, Inc. vs. Wallace E. Heck, suit no. 273,702.
I. MARK K. ANDERSON AND KELLOGG-MOORE OIL COPANY, INC.'S CLAIM FOR $300,000.00.
Mr. Heck readily admitted the $300,000.00 had not been paid.
II. WALLACE E. HECK, SR.'S CLAIM
1. Misstatement of Financial Condition... Changes in February, 1983 Statement
Mr. Heck claims that plaintiffs have breached paragraph 4(h) of the contract to buy and sell corporate stock (Exhibit P-1, page 4). Paragraph 4(h) provides:

"Absence of certain changes or events. Since January 31, 1983, there has not been any change in H.G.'s financial condition, assets, liabilities or business other than changes in the ordinary course of business, none of which have been materially adverse."
*711 The February 1983 general ledger, prepared after the close of February and not available until mid-March 1983, reflected a $78,842.34 loss. This ledger was presented to Mr. Heck in mid-March 1983. According to Mr. Heck's testimony, he was motivated to acquire a going concern, not only the franchise, and that he would not have purchased the stock had he known of the February loss.
Ted A. Soileau, a certified public accountant with Postlewaite & Netterville, testified that the $78,842.34 loss of February 1983 was composed of normal recurring operating transactions, some of which were higher for February. The obvious increases were:

(1) Freight cost $6,204.00
(2) Floor plan interest January 7,493.33
(3) Floor plan interest February 7,161.15
(4) February interest on notes 7,714.64
(5) Inventory Adjustments 10,082.52
(6) Entry for correction of
 January interest 10,072.00
 __________
 $48,727.64

He also testified that February sales were down to roughly $250,000.00 and they had been maintaining an average level of around $300,000.00 or more per month. Also he noted that cost of goods sold had increased percentage-wise from previous months.
Although Mr. Heck received the February statement in mid-March 1983, he made no objections and finalized moving H.G.'s business to Baton Rouge, Louisiana in April 1983. Considering the testimony of Mr. Soileau and Mr. Heck's actions, this court does not find that the $78,842.34 loss in February 1983 constitutes a breach of paragraph 4(h) of the contract.
2. Cancellation or Non-Timely Renewal of Franchise
Paragraph II of the contract provides:
"Distributor Sales Agreement
Purchaser is aware of certain distributor sales agreements between H.G. and Ariens Corporation, and Outboard Marine Corporation (Lawnboy Division). Purchaser is aware that the contracts may be terminated with H.G. in the event of a change of ownership."
The addendum of March 1, 1983, provided in part:
"Seller and Purchaser agree that they will individually and collectively exert their best efforts toward obtaining renewals of existing distributing agreements and that neither will do anything detrimental to obtaining such renewals.
In the event Purchaser uses his best efforts to obtain renewals of the distributorship agreements mentioned hereinabove but such original renewal or renewals are denied by Ariens Corporation or Outboard Marine Corporation on or before September 30, 1983, then the sales price shall be reduced by the sum of One Hundred Fifty Thousand and No/100 ($150,000.00) Dollars for each distributorship not obtained."
On July 26, 1983, H.G. Distributors, Inc. signed a distributor agreement with Ariens Company which was approved on August 30, 1983, by Ariens for the period of July 1, 1983, to June 30, 1984. Therefore, the Ariens franchise is not at issue.
Subsequent to his purchasing H.G. Distributors, Inc., Mr. Heck, his son and Mr. McDonald met with Outboard Marine Corporation (hereinafter referred to as OMC-Lawnboy) representatives in Illinois concerning the renewal of the franchise. On April 6, 1983, Mr. Heck received a letter from Mr. Reynolds of OMC-Lawnboy Corporation authorizing the transfer of the franchise to September.[1] After the April 6, 1983 letter, OMC-Lawnboy sent Mr. Heck a letter on April 11, 1983, enclosing personal guaranty forms for their joint signatures. On May 13, 1983, Mr. Heck wrote OMC-Lawnboy stating he had not received the guaranty forms. On May 17, 1983, *712 OMC-Lawnboy acknowledged receipt of Mr. Heck's letter and forwarded additional copies of the guaranty forms. On May 24, 1983, Lawnboy wrote Mr. Heck about his not having received the guaranty forms and sent additional forms asking that they be executed and immediately returned. Finally Mr. and Mrs. Heck executed the forms on May 30, 1983 (Exhibit Defendant-N, O, P, Q & R).
It is Mr. Heck's contention that OMC-Lawnboy did not renew the franchise in accordance with the Addendum to the Contract between the parties. He suggests that plaintiffs were aware of OMC-Lawnboy's displeasure with H.G. Distributors, Inc.'s performance prior to his acquisition and withheld this information.
The evidence is clear that after Mr. Heck's acquisition of H.G. Distributors, Inc. on March 1, 1983, H.G. Distributors, Inc. continued as OMC-Lawnboy's franchise dealer under the existing franchise agreement. OMC-Lawnboy issued a renwal franchise on February 7, 1984, effective to September 30, 1984. Mr. Heck testified that sometime after September 30, 1983, OMC-Lawnboy quit shipping parts and units until after the February 7, 1984 franchise was executed. The evidence is not clear as to the volume of parts and units ordered and not delivered during this period of time. However, Mr. Heck did testify that OMC-Lawnboy never told him they would or would not renew the franchise prior to February 7, 1984.
The Addendum to the Contract provides that the reduction of $150,000.00 is applicable if the original renewal or renewals are denied by OMC-Lawnboy on or before September 30, 1983. The language of the Addendum does not require the issuance of the renewals on or before September 30, 1983. Since there was not a denial by OMC-Lawnboy on or before September 30, 1983, Mr. Heck is not entitled to a reduction of the sale price of $150,000.00.
3. Misstatement of Inventory
After execution of the March 1, 1983 contract, Shirley Heck testified she performed a physical inventory and there was a shortage of $11,000.00. Mr. Anderson agreed that if there was an inventory discrepancy it would be made up. The Court finds that Mr. Heck is entitled to a $11,000.00 credit.
4. Heater Return
Prior to Mr. Heck's acquisition, H.D. Distributors, Inc. sold kerosene heaters to K & D Rental and C & D Rental, two Baton Rouge, Louisiana retailers. At the time or subsequent to the sales, Larry McDonald, President of H.D. Distributors, Inc., informed K & D Rental and perhaps C & D Rental that if the heaters were not sold, then H.D. Distributors, Inc. would allow the retailer(s) to return the heaters provided they would purchase $2.00 of merchandise for every $1.00 returned. After Mr. Heck's acquisition, K & D Rental returned heaters valued at $28,415.02 and C & D Rental returned heaters valued at $18,093.06.
The guarantee made to K & D Rental and perhaps to C & D Rental by H.D. Distributors, Inc. without informing Mr. Heck of such, if constituting a misrepresentation, does not allow Mr. Heck grounds for recovery inasamuch as the evidence does not disclose the amount of merchandise Mr. Heck sold the two retailers after extending the credit nor does the evidence reflect the amount Mr. Heck received from the subsequent sale fo the heaters.
The burden of proof by a preponderance of the evidence has not been carried by Mr. Heck in showing H.D. Distributors, Inc.'s loss.
5. Transfer of Heaters
Mr. Heck's next complaint is that he was not advised prior to March 1, 1983, by the principals of H.D. Distributors, Inc. that it had made inventory transfers of heaters without profit. Apparently H.D. Distributors, Inc. had an excess inventory of heaters *713 on which a balance was owing OMC-Lawnboy. H.D. Distributors transferred these heaters to another distributor, then notified OMC-Lawnboy of the transfer. OMC-Lawnboy would then credit H.D. Distributors, Inc.'s account on the value of the transfer and debit the receiving distributor's account.
The transfer of heaters to the receiving distributor was never reflected in H.D. Distributors, Inc.'s gross sales. Mr. Heck's testimony indicates that one of the important factors in his decision to acquire H.D. Distributors, Inc. was its prior gross sales. Ted Soileau, a CPA and expert witness, testified that the inventory transfers did not affect the percentage of profit since the percentage of profit is only predicated upon actual sale transactions. Mr. Soileau further testified that the monthly gross profit percentages revealed a steady rate from September 1982 to January 1983. That the February 1983 gross profit percentage dropped sharply from above 20% levels maintained for all previous months to a 14.54% level. This decrease was primarily due to a slight decrease in sales coupled with an increase in cost of goods soldparts.
Since the transfer of inventories did not affect the gross profit percentages, the Court does not find that a misrepresentation occurred.
6. Accounts Receivable
When Mark Anderson and Kellogg-Moore Oil Company acquired H.D. Distributors, Inc.'s stock from McDonald, Evans and Central Oil and Supply Corporation, they agreed that the accounts receivable would be split when collected. This splitting arrangement was not explained to Mr. Heck. It was Mr. Heck's understanding that he would become owner of the accounts receivable upon purchasing the stock.
The Court finds that Mr. Heck was not advised of the splitting arrangement, accordingly, he is entitled to a credit for one-half the value of accounts receivable he did not acquire.
Exhibit D-48 reflects that the accounts receivable were listed at $35,450.51 as of January 12, 1983, and that $5,443.28 was collected as of March 18, 1983. The balance, $30,007.23, is owned one-half by Mr. Heck and one-half by Anderson and Kellogg-Moore Oil Company's predecessor. Mr. Heck's loss will be the value of one-half ($15,003.61) accounts receivable he did not receive.
The accounts were listed as being from August 31, 1982, to January 12, 1983. Accounts receivable are usually of less value as the delinquency increases. The Court fixed the value of the accounts receivable not received by Mr. Heck as $9,000.00.
7. Office Furniture and Equipment
Mr. Heck claims that the furniture and equipment shown to him as belonging to H.D. Distributors, Inc. was not delivered to him because some employees claimed certain items as being personally owned by them. Before this court can award damages there must be evidence as to the value of the furniture and equipment that was not delivered to Mr. Heck. This burden has not been carried by Mr. Heck. No credit is allowed.
8. Unpaid Taxes
Mr. Heck claims that he is entitled to a credit for taxes paid by H.D. Distributors, Inc. for taxes owing prior to his acquisition. Payments made for taxes incurred after Mr. Heck's acquisition are not recoverable. Exhibits D-35 and 37 are for 1983 taxes paid in December 1983.
Exhibit D-39 is a $6,000.00 receipt for payment of 1982 taxes. Also Exhibit D-41 is a receipt for $344.66 for payment of 1982 taxes. Mr. Heck is entitled to a credit of $6,344.66.
9. Misstatement of Dealers
Mr. Heck alleges that the number of dealers was misrepresented to him. According to Mr. Heck, he was supplied a list of dealers and after acquiring H.D. Distributors, Inc., he checked some and found they were out of business.
*714 The evidence does not reflect that Mr. Moore made any representation as to the volume of sales one could expect from the individual dealers. Again, we have information disclosed to Mr. Heck prior to March 1, 1983, which he took no steps whatsoever to verify as to what volume the individual dealers were ordering from H.D. Distributors, Inc.
This claim is without merit.
10. Promotional Items
Mr. Heck complains that promotional items were shown in the inventory. Mr. Anderson testified that if promotional items were in the inventory this was not a misrepresentation for H.G. Distributors, Inc. did not get the items free.
This claim is without merit.
III. RECONVENTIONAL DEMAND
In paragraph XII of Mr. Heck's reconventional demand he seeks damages on seven items, five of which have been previously discussed. The remaining claims for damages are:
(e) loss of profits and sales by virtue of annual income statement not being properly reflected on the balance sheet $100,000.00
(g) general damage for lost profits, future revenues and inconvenience by virtue of failing to reveal all material knowledge concerning the Lawnboy franchise $2,500,000.00
The above claims are not recoverable by Mr. Heck. These claims are alleged damages suffered by the corporation, not Mr. Heck. Any losses Mr. Heck has suffered are indirect, as a stockholder. He may not recover for these damages himself. Hinchman v. Oubre, 455 So.2d 1313 (La. App. 5th Cir.1984).
ConclusionSuit 273,702
Considering Mr. Heck's credits of $26,344.66, judgment is rendered in favor of Mark K. Anderson and Kellogg-Moore Oil Company, Inc. and against Wallace E. Heck, Sr. for $273,655.34 together with legal interest from September 30, 1983, until paid and for cost. Mark K. Anderson and Kellogg-Moore Oil Company are to deliver their stock certificates in H.G. Distributors, Inc. upon payment by Mr. Heck.
Suit 284,343
Howard Griffin Distributors, Inc. filed suit against H.G. Distributors, Inc., Mark K. Anderson, Kellogg-Moore Oil Company, Inc. and Wallace E. Heck, Sr., for collection of the two notes originally given to it in October 1980. These notes were made by H.D. Distributors, Inc. and originally guaranteed by McDonald, Evans and Central Oil and Supply Corporation. Thereafter, Mark K. Anderson and Kellogg-Moore Oil Company, Inc. replaced the original guarantors. When Mr. Heck purchased the stock of H.D. Distributors, Inc. on March 1, 1983, he personally agreed to pay these notes.
NoteOctober 13, 1980
On October 13, 1980, H.D. Distributors, Inc. executed a $76,207.71 note payable to Howard Griffin Distributors, Inc., bearing an annual interest of 10% from October 13, 1980, until paid. The note is payable $10,886.82 on the 13th of October 1981 and on the 13th of October in each succeeding year until paid. The note provides for an acceleration of all installments if any installment remains unpaid for a period of 20 days after its due date. The note further provides for attorney fees if placed with an attorney for collection.
Mr. John L. Luffey, Jr. testified that after Mr. Heck made the 1983 installment on December 15, 1983, the balance on the note was $43,547.31. That after Mr. Heck failed to make the October 1984 installment, Mark K. Anderson and Kellogg-Moore Oil Company, Inc. paid the installment of $10,886.82. The balance owing on the note after the October 1984 installment is $32,660.51.
Also Mr. Luffey testified that Howard Griffin Distributors, Inc. has been dissolved and its assets are owned by the Successions of Howard Griffin and Birdie McMurrain Griffin.
H.G. Distributors, Inc. filed a reconventional demand against Howard Griffin Distributors, *715 Inc. and Howard Griffin claiming credit for $36,423.52 of merchandise sold to Howard Griffin Distributors, Inc. It was alleged that Mr. Howard Griffin had signed a continuing guarantee and indemnity agreement covering debts owed by Howard Griffin Distributors, Inc. to H.G. Distributors, Inc.
The invoices and statement generated with regards to the offsets show that the purchaser was Howard Griffin, Inc. and the balance owing is $36,179.71. Mr. Heck, Jr. testified that Mr. Griffin agreed to the offset. Mr. Heck, Sr. testified that he spoke to Mr. Griffin about the balance owing and Mr. Griffin allegedly told Mr. Heck, "Pay me and I will get the company to pay you."
The Court does not find that H.G. Distributors, Inc. is entitled to a credit for the unpaid account of Howard Griffin, Inc., the purchaser shown on Exhibit D-L.
Judgment is rendered in favor of John L. Luffey, Jr., executor of the Estates of Howard Griffin and Birdie McMurrain Griffin and against H.G. Distributors, Inc., Mark K. Anderson, Kellogg-Moore Oil Company, Inc. and Wallace E. Heck, Sr. for the sunm of $32,660.51, together with interest at the rate of 10% per annum from October 15, 1984, until paid, together with 10% of the amount owing (principal and interest) as attorney fees.
Further, Mark K. Anderson and Kellogg-Moore Oil Company, Inc. are entitled to be indemnified against H.D. Distributors and Wallace E. Heck, Sr., in solido, for any sums either may pay on this judgment.
NoteOctober 21, 1980
The October 21, 1980 note is payable to the order of Howard Griffin Distributors, Inc. for $82,154.87 with annual interest of 10% and signed by H.G. Distributors, Inc. with McDonald, Evans and Central Oil and Supply Corporation as guarantors. These guarantors were released and replaced by Mark K. Anderson and Kellogg-Moore Oil Company. Under the March 1, 1983 contract, Mr. Heck became obligated to pay this rate.
The October 21, 1980 note does not provide for acceleration nor specify for the payment of attorney fees.
Mr. John L. Luffey, Jr., executor of the Estates of Howard Griffin and Birdie McMurrain Griffin, testified that after Mr. Heck paid the 1983 installment on December 15, 1983, the balance owing on the note was $38,052.99. That after Mr. Heck failed to pay the 1984 installment, demand was made on Mr. Anderson and Kellogg-Moore Oil Company, Inc., who paid the October 1984 installment, leaving a balance of $28,539.79.
Since the October 21, 1980 note does not provide for an acceleration of unpaid installment in case of default, it is necessary for the Court to determine whether the balance can be collected under the doctrine of anticipatory breach of contract. Anticipatory breach of contract is not recognized in cases involving unilateral contracts. The Doctrine of Anticipatory Breach of Contract, 20 La.Law Review 119.
Howard Griffin Distributors, Inc.'s suit was amended in March 1987 and according to Mr. Luffey, no payments have been received on the October 21, 1980 note since the October 15, 1984 payment. The 1985 and 1986 installments are due and owing.
Judgment is rendered in favor of Howard Griffin Distributors, Inc. and against H.G. Distributors, Inc., Mark K. Anderson, Kellogg-Moore Oil Company, Inc. and Wallace E. Heck, Sr. for $9,513.20 together with 10% interest from October 21, 1984, until paid and for $9,513.20 together with 10% interest from October 21, 1985, until paid.
Further, judgment is rendered herein in favor of Mark K. Anderson and Kellogg-Moore Oil Company, Inc. and against H.G. Distributors, Inc. and Wallace E. Heck, Sr. for indemnification for any payments Mark K. Anderson and Kellogg-Moore Oil Company, Inc. might make on this judgment.
As previously mentioned, Mark K. Anderson and Kellogg-Moore Oil Company, Inc. paid the 1984 installments of $27,200.02 and attorney fees of $1,215.00 for a total payment of $28,415.02. Accordingly, Mark K. Anderson and Kellogg-Moore Oil *716 Company, Inc. are entitled to judgment on their third party demand against H.G. Distributors, Inc. and Wallace E. Heck, Sr. in solido for the sum of $28,415.02 together with legal interest from filing of the third party demand on March 10, 1987, and cost.
Judgment will be signed accordingly.
BATON ROUGE, LOUISIANA, this 11th day of December, 1987.
 (s) William H. Brown
 WILLIAM H. BROWN,
 Judge

AMENDED WRITTEN REASONS FOR JUDGMENT
On December 11, 1987, this court issued written reasons for judgment, which are amended as hereinafter set forth:
(1) Page 9 of written reasons, paragraph 1, last sentence shall read:
"Mark K. Anderson and Kellogg-Moore Oil Company, Inc. are to deliver their stock certificates in H.G. Distributors, Inc. to Wallace E. Heck, Sr. upon satisfying this judgment."
(2) Page 11 of written reasons, paragraph 5, shall read:
"H.G. Distributors, Inc., Mark K. Anderson, Kellogg-Moore Oil Company, Inc. and Wallace E. Heck, Sr. shall pay to John L. Luffey, Jr., executor of the Estates of Howard Griffin and Birdie McMurrain Griffin, the October 21, 1980 promissory note of $82,154.87 on which there is a current balance due of $28,539.79 and only the sum of:
(a) $9,513.20 with 10% interest from October 21, 1984, until paid, and,
(b) $9,513.20 with 10% interest from October 21, 1984, until paid,
which is presently owing; said H.G. Distributors, Inc., Mark K. Anderson, Kellogg-Moore Oil Company, Inc. and Wallace E. Heck, Sr. shall pay the balance as it becomes due."
Further, the reconventional and third party demands of Wallace E. Heck, Sr. be and are dismissed at his cost.
Judgment will be signed accordingly.
BATON ROUGE, LOUISIANA, this 21st day of January, 1988.
 (s) William H. Brown
 WILLIAM H. BROWN, Judge
ALFORD, Judge, concurring.
I concur in the opinion of the majority in all respects with the exception of the section entitled "Louisiana Securities Law." Although I am in agreement with the result reached by the majority, I do not agree with the rationale and cannot join in the opinion insofar as it holds that the stock involved herein was not a "security" falling within the purview of the Louisiana Blue Sky Law.[1] The majority finds no ambiguity in the term "stock"; clearly what is meant by the term is capital stock in a corporation. However, the majority nevertheless examines legislative intent in the enactment of the Blue Sky Law and concludes that the legislature did not intend the statutory definition of "security" as "stock" to cover instances where stock is sold to transfer 100% of the interest in a closely held corporation.
Where the meaning of a statute is clear and unequivocal, the court has nothing to do with its policy or impolicy and has the duty to expound and administer the law as it is written; any other course would require the court to abandon its judicial function and assume the legislative function, which it cannot do. State v. Maestri, 199 La. 49, 5 So.2d 499 (1941). See also La. C.C. art. 9; La.R.S. 1:4; Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir.1984). The definition of security found in former La. R.S. 51:701 of the Blue Sky Law makes no distinction between sales involving a portion of the stock of a corporation and sales involving 100% of the stock of a corporation. Where a statute makes no exceptions, the court cannot do *717 so. Owles v. Jackson, 199 La. 940, 7 So.2d 192 (1942).
Applying the Blue Sky Law to the present case, the same result is reached as that of the majority. Since the present transaction occurred in 1983, it would have been exempt at that time, from the entire Blue Sky Law. La.R.S. 51:705(12) provided as follows:
Except as hereinafter expressly provided, the provisions of this Part shall not apply to the sale of any security in any of the following transactions:
....
(12) Any transaction not involving any public offering pursuant to which, during any period of twelve consecutive months, not more than thirty-five persons in this state become purchasers of such securities, other than those designated in Paragraph (5) of this Section, provided the buyers represent that they are buying for investment and not for public distribution or resale, but the commissioner may by rule or order, as to any security or transaction or any type of security transaction, withdraw or further condition this exemption, or increase or decrease the number of offerees or purchasers permitted.
The word "Part" in the quoted section, refers to: "PART X. SECURITIES BLUE SKY LAW", which encompasses sections 701 through 720, including 51:715, the anti-fraud provisions of the statute.[2] Accordingly, I would find that the instant transaction falls within the purview of the Blue Sky Law, and that, the provisions of the law as it existed in 1983, exempted the transaction from its application.
For the above reasons, I respectfully concur.
NOTES
[1] Sellers assert that the Louisiana Securities Law claim is an affirmative defense which was not specifically pled nor was evidence adduced and directed to such an issue at trial and therefore should not be considered by this court. For the reasons set forth herein, we need not address this contention of the sellers.
[2] Under the provisions of former LSA-R.S. 51:705(12), the present sale was clearly exempt from the registration provisions of the law. Sellers contend that the sale is also exempt from the antifraud provisions of the Louisiana Blue Sky Law under former LSA-R.S. 51:705(12). Because we find the antifraud provisions inapplicable to the facts of the instant case for other reasons, we do not reach this issue.

We note however that the application of the antifraud provisions to exempt securities transactions has now been clarified by the Commissioner of Securities in Title 64, Section 701 B. of the Louisiana Administrative Code. Section 701 B. specifically provides that "[n]othing in these exemptions is intended to or should be construed as in any way relieving sellers or persons acting on behalf of sellers from providing disclosure to prospective investors adequate to satisfy the antifraud provisions of this state's securities law."
[3] Former LSA-R.S. 51:701 in pertinent part reads as follows:

When used in this Part, unless the text otherwise indicates, the following terms shall have the meanings herein ascribed to each:
(1) "Security" shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, warehouse receipt, certificate of interest or participation, or the right to subscribe to any of the foregoing, certificates of interest in a profit sharing agreement, certificate of deposit for a security, collateral trust certificate, pre-organization certificate, pre-organization subscription, voting trust certificate, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim bond, debenture, note, certificate, or receipt for, guarantee of, or warranty or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or annuity contract fixed or variable, which is authorized to be written pursuant to Title 22 of the Louisiana Revised Statutes of 1950, as amended.
[4] Notwithstanding the inapplicability of the Louisiana Securities Law, we note that the purchaser not only had a contract claim but a tort claim for negligent misrepresentation.
[5] For an excellent discussion of this issue see The Death of the Sale of Business Doctrine After Landreth Timber Co. v. Landreth: A Proposal for Statutory Revival, 23 Houston Law Review 1039.
[6] Although the contract placed limitations upon purchaser's control of the corporation until closing, we note that a Unanimous Consent Resolution was signed by the sellers, giving Mr. Heck, Jr. unlimited power to conduct all of the affairs and business of the corporation, in his sole discretion.
[7] We also note that Mr. Heck's son, Wallace E. Heck, Jr., testified that they ended up selling "approximately 1650 heaters for in the neighborhood of $55,000.00" He also stated that the loss was over $250,000.00, considering the average cost of a heater was $100.00, and they sold them for $30.00. There is also testimony that after Mr. Heck took control of the management of the business, and after he discovered the large inventory of heaters, he purchased more heaters in order to take advantage of a manufacturer's credit.
[8] Although the sellers contend in brief that the trial court erred in awarding any amount for the accounts receivables they have not appealed the trial court's judgment, or answered this appeal. Thus, their alleged error is not before the court. LSA-C.C.P. art. 2133.
[9] We note that the purported guaranty contains no information concerning the account other than the corporate name, Howard Griffin, Inc. and Mr. Griffin's signature.
[10] Although the effective date of the sale was February 1, 1983, the documents were not signed until June 1983.
[11] In reference to the October 21, 1980 promissory note, appellee, Howard Griffin Distributors, Inc. contends that the trial court erred when it refused to apply the doctrine of anticipatory breach. Because appellee did not appeal nor answer the appeal, their alleged error is not before the court. LSA-C.C.P. art. 2133.
[1] Mr. Heck testified the April 6, 1983 letter gave H.G. Distributors, Inc. the franchise for 1984. It is the Court's opinion that this letter merely authorized the continuation of the 1982-1983 franchise.
[1] The Blue Sky Law, set forth at La.R.S. 51:701 to 51:720 of the Louisiana Revised Statutes of 1950, was amended and reenacted by Acts 1985, No. 722 and now consists of La.R.S. 51:701 to 51:724. The reenacted provisions are now referred to as the "Louisiana Securities Law." Since the sale involved herein took place in 1983, the Blue Sky Law governed and references herein are to those provisions.
[2] Prior to 1984, the Commissioner of Securities had not issued any rule or order affecting the exemption granted by former La.R.S. 51:705(12) as authorized therein. In October of 1984, the Commissioner did promulgate the Private Offering Exemptions in the La.Admin.Code, Title 64, § 701 et seq. These rules specifically provided that private offerings "are not exempt from the anti-fraud, civil liability or other provisions of the [securities] Law." This restriction on the exemption of La.R.S. 705(12) was carried through in La.R.S. 709(15) of Acts 1985, No. 722.