I2FOGG, Judge.
By this suit, plaintiffs seek to recover payment for damages to their apartment complex caused by termites during the term of a pest control contract entered into by the parties. The trial court rendered judgment in favor of plaintiffs; defendants appeal.
The construction on the Tudor Chateau Creole Apartments (Chateau Creole) began in 1978. During the construction phase, D.A. Exterminating Co., Inc. provided the pretreatment for termites and, for the next- two years, Chateau Creole maintained a termite contract with D.A. Exterminating. After that period, the contract lapsed and Chateau Creole did not contact D.A. Exterminating again until 1984 when they discovered a problem with termites. At that time, the parties entered into a contract for the eradication of termites at the apartment complex; the contract was renewed on an annual basis through 1994.
Although D.A. Exterminating provided an annual inspection in anticipation of the contract renewal, over the course of ten years, termites were discovered on the property on several occasions. In 1993 serious termite infestation was discovered and Chateau Creole requested that D.A. Exterminating not only eradicate the termites, but also pay for the repairs to the buildings that was necessitated by the damage caused by the termites. Through negotiations prior to the filing of this suit, DA Exterminating paid for 50% of the repairs that were undertaken by Chateau Creole. However, the parties
could not agree to an amicable settlement for a remainder of the cost of repairs and this lawsuit was filed.
After a trial, the court found in favor of the plaintiffs and awarded the following damages: $34,685.00 for out-of-pocket expenses; $102,000.00 for the cost of repairs of termite damage; $3,984.00 for the loss of rental income; $10,000.00 for the cost of new termite contract; and $150,000.00 for diminution in the value of the property. The plaintiffs were assessed 16% fault for allowing conditions to exist that were conducive to termite 13infestation. D.A. Exterminating appeals and assigns five specifications of error.
D.A. Exterminating initially contends that the trial judge erred in finding it liable to Chateau Creole for the termite damage to the structure. In support of this argument, the appellant relies on LSA-C.C. art.2046 and the terms of the 1984 contract which state, in pertinent part:
1. Should a reinfestation occur in any portion of the building covered by the Contract, the Contractor agrees to treat such infested portions within thirty (30) days of discovery of such reinfestation without additional charge to the Owner.
[[Image here]]
3. RETICULITERMES — SUBTERRANEAN TERMITES
[[Image here]]
b. Slab Construction: Due to extreme hazards encountered in existing slab construction and the possibility of hidden infestation, the Contractor cannot be held responsible for any damage to the structure or its contents caused by subterranean termite activity.
[[Image here]]
6. The Owner warrants full cooperation •with the Contractor during the life of this contract, and agrees to maintain the area treated free from any factor contributing to infestation, such as wood, trash, lumber, or direct wood-soil contact in the area treated, and agrees not to make any alterations or additions to the structure without notifying the Contractor prior to alterations, and agrees to eliminate faulty *1262 plumbing, leaks, dampness from drains, condensation or leaks from the roof or otherwise into, onto or under said area treated. At no time will damage caused to any portion of the structure, even by active termites infestation, be the responsibility of the termite Contractor in areas where any of the conditions described in this paragraph exist.
Although these cited portions of the contract would, at first, appear to absolve D.A. Exterminating of any liability, LSA-C.C. art. 2004, which provides for circumstances that will nullify contract clauses, states, in pertinent part:
Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.
The question' to be resolved in this appeal is, therefore, whether the actions of D.A. Exterminating were mere negligence |4for which D.A. Exterminating is not liable or intentional misconduct or gross fault which would be outside the scope of the exculpatory clauses. Our review of the record shows the D.A. Exterminating’s actions did not constitute intentional misconduct, therefore, our review is confined to determining if the trial court was correct in his judgment that appellants’ actions were grossly negligent.
The Louisiana Supreme Court in Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, p. 5-6 (La.7/5/94); 639 So.2d 216, 219-220 defined gross negligence as follows:
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the “want of even slight care and diligence” and the “want of that diligence which even careless men are accustomed to exercise.” State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the “entire absence of care” and the “utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.” Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an “extreme departure from ordinary care or the want of even scant care.” W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, Sec. 34, at 211 (5th ed.1984); 65 C.J.S. Negligence, Sec. 8(4)(a), at 539-40 (1966 & Supp.1993). “There is often no clear distinction between such [willful, wanton, or reckless] conduct and ‘gross’ negligence, and the two have tended to merge and take on the same meaning.” Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
In their defense, appellants aver that a portion of the termite damage was caused by moisture at the complex and that the termites did not come from the ground. Appellants’ witness, Floyd Milford, a Civil Engineer, testified extensively about the water damage to the complex. The record, which included pictures, reveals that the water damage was confined to the second story of the buildings, i.e., the gutters and soffits. Furthermore, Gary Ryder, the operations manager for Tudor Enterprises, was called as a rebuttal witness and testified that many of the water stains were caused by pressure washing.
Several other witnesses testified that the termites were | scorning from the ground. James Arceneaux, an expert in structural pest control, subterranean termites and wood destroying insects, testified that the termites were coming from the ground. Lisa Gau-treaux, an agriculture environmental specialist supervisor employed by the Louisiana Department of Agriculture, testified that, of the six locations of infestation she viewed, one may have been due in part to some moisture above ground and the other locations appeared to have originated from the ground. Finally, Mansel Smith, who testified for appellants, stated, under cross examination, that his report and graphs showed that the termites were in the expansion joints. Although appellants inspected the property on an annual basis, they claim that they did not “discover” the infestation in the expansion joints/cold joints until-1993, the year of *1263 the major infestation. Appellants claim they could not see the expansion joints/cold joints because the siding covered them. However, all witnesses testified that the expansion joints could be seen in the doorways of each of the 104 first-floor apartments. Based on the testimony, the trial court determined that the termites were not drawn to the buildings by the moisture problems, but from the ground. We find no manifest error in this determination.
The evidence of this case establishes that “drilling” is a very important process in termite eradication. This process, when done correctly, cuts the termites off at the ground level and effectively stops infestation. The contract that the parties entered into in 1984 included the following language (a portion of which was a typewritten addition):
The Contractor agrees to trench and treat soil adjacent to slab, drill walkways and treat soil beneath, treat area at bathroom traps.
It is abundantly clear from the record that appellants did not drill the walkways in 1984. This is a clear violation of the terms of the contract. Finally, in 1993, appellants did drill the property; however, James Areen-eaux testified that he found drill holes thirty-six inches apart, forty-eight inches apart | eand, in one case, six feet apart, even though the state minimum requirements call for drilling to be done every twenty-four inches. The appellants’ witnesses testified that the drill holes were in compliance with state minimum requirements.
All of the testimony in this case, including that of appellants’ witnesses, indicate that the termite damage to this complex was extensive. Further, we reviewed photographs and a video of the termite damage to appel-lee’s property, and saw evidence of vast destruction. D.A Exterminating had an annual contract to inspect the property, yet several times during the life of the contract D.A. Exterminating had to be called back to the site for active termite infestation. Finally, in 1993, extensive termite damage was found by appellees; damage that was obviously caused during the term of their contract with D.A. Exterminating. Viewing all the evidence, we cannot say the trial court manifestly erred in his determination that D.A. Exterminating was grossly negligent.
Appellants further rely on the following portion of the 1984 contract:
[n]o cause of action or claim for damages sljall be filed in a court of law until an inspection of the property has been made by an inspector of the Louisiana Structural Pest Control Commission to verify the fact that the damage has been caused by the wood destroying organisms specified in this contract and there is evidence of gross negligence by the contractor in the original treatment or retreatment of said property.
Appellants argue that there was no evidence provided at trial that an inspector of Louisiana Department of Agriculture found D.A. Exterminating was grossly negligent. This appears to be an argument of prematurity. The time for pleading the dilatory exception of prematurity is prior to answer or judgment of default. LSA-C.C.P. art. 928(A). The objection of prematurity is waived unless pled in the dilatory exception. LSA-C.C.P. art. 926. Therefore, this prematurity argument which is based on the failure to comply with a contractual provision, was waived when D.A. Exterminating answered appellee’s original petition without a prior pleading of that dilatory exception. J^LSA-C.C.P. arts. 926 and 928(A). Once waived, the prematurity argument could not be resurrected by camouflaging it as a substantive issue. Barrie v. V.P. Exterminators, 625 So.2d 1007 (La.1993).
Appellants next argue that the trial court erred in finding Chateau Creole was only 16% at fault in causing its own damages. In support of this argument, appellants rely on the fact that in most, but not all, of the annual inspections they provided the appel-lees with notification that there existed conditions which were conducive to termites at the site. We find this assignment of error without merit also. Both James Arceneaux and Lisa Gautreaux testified that it is common practice for a pest control company to withhold treatment or cancel a contract until a client clears up any conducive conditions. In this case, DA. Exterminating pointed out the conditions, but failed to provide any fol *1264 low up related to this concern. Further, D.A. Exterminating continued to do annual inspections and receive payment for them. The trial court relied on the testimony of Lisa Gautreaux in determining that the ap-pellees were 16% at fault. In this determination, we find no manifest error.
Appellants’ final assertion relates to the monetary award made by the trial judge. The first award was for out-of-pocket expenses. Gary Ryder testified that, when the termite damage was discovered in 1993, it was his understanding that D.A. Exterminating would be responsible for all repairs; at that time, Chateau Creole began repairing the termite damage. When the repair cost reached $22,909.95, a bill was sent to appellants who sent a check for half that amount. Shortly thereafter, another bill was submitted for $30,481.18; subsequently, appellants paid half that amount for a total of $26,-695.56. Although the contractor, Leander Pitre, Jr., who undertook the work did not testify, the invoices for those repairs were made part of the record and Gary Ryder testified as to their authenticity and, further, that all of the work was due to termite damage and not damage caused by Hurricane Andrew or water damage. Appellants Ighave presented no evidence that these repairs were not done for the purpose of repairing termite damage and were not billed as represented in the invoices. Accordingly, we find that the testimony of Gary Ryder, along with the invoices, was sufficient to prove this expense. Peterson v. Parish of Jefferson, 95-711 (La.App. 5 Cir. 2/27/96); 668 So.2d 1386, writ granted in part, 96-0854 (La.5/10/96); 672 So.2d 670.
Appellants also contest the award of $7,089.00 for out-of-pocket expenses, which Gary Ryder testified, was spent by the maintenance staff in termite repair. Unlike the costs listed above, Gary Ryder presented no invoices for this amount, no canceled checks and no work orders showing the work was done. A plaintiff has the burden to prove with legal certainty damage claimed. Plaintiff’s own uncorroborated personal estimate of loss is insufficient. Keaty v. Moss Motors, Inc., 93-1452 (La.App. 3 Cir. 6/1/94); 638 So.2d 684, writ denied, 94-2211 (La.11/11/94); 644 So.2d 399. Accordingly, we must reverse the trial court’s award of out-of-pocket expenses by $7,089.00.
Next, appellants contest the trial court’s award of $102,000.00 for future repairs to the complex, arguing that the amount was purely speculative. We disagree. Gary Ryder, who is an expert in the field of general contracting, testified as to the cost for future repairs of approximately $106,000.00 based on $54,000.00 to remove siding on the front of the 208 units and inspect damage, and $52,000.00 for removing sheet rock and inspecting the inside of each of the 208 units. These costs were for inspection only, and did not include any remedial repairs. Appellants’ own witnesses testified the estimated cost for repairs was $2500.00 per unit. One of these witnesses testified he observed thirty-four units with damage and the other witness testified to forty-nine units with damage. Additionally, all of these witnesses, and others, testified that there was no way to ascertain how many other units had suffered damage until the siding and sheetrock were removed. Accordingly, we find that the trial judge did not abuse its discretion in awarding of 19$102,000.00.
Finally, the appellants argue that the trial court erred in awarding both cost of repairs and diminution in the value of the property. In support of this argument, appellants cite Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993), which they summarize as standing for the proposition that when a person’s property is damaged, he is entitled to cost of restoration or the difference between the value of the property before and after the harm. We, however, read the holding of that case more broadly and find the following language, included in the opinion, instructive:
The teachings of the cases approximating Restatement (Second) of Torts Sec. 929 and its comments, when applied as flexible guides rather than as arbitrary formulae, tend to foster the same goals established by our Civil Code and state constitutional property damage principles, i.e., they tend to compensate the victim to the full extent *1265 of this loss and restore him to as good a position as he held prior to the damage. La. Civ.Code art. 2315; La. Const.1974, Art. I Sec. 4.
Roman Catholic Church of Archdiocese of New . Orleans v. Louisiana Gas Service Co., 618 So.2d at 879.
The emphasis is on restoring the victim to a position as good as he held prior to the damage. There is no formula which can be applied with exactitude in the assessment of property damages. Each case must rest on its own facts and circumstances as supported by proof in the record. Where there is a legal right to recovery of damages but the amount cannot be exactly determined, the courts have reasonable discretion to assess them based upon all the facts and circumstances of the particular ease. Fortson v. Louisiana Power & Light Co., 509 So.2d 743 (La.App. 3 Cir.1987).
In the instant case, the record clearly indicates that the total termite damage is uncertain. The only way to determine the extent of the damage is to remove all siding and sheetrock; such actions would be cost prohibitive and is termed as “destructive testing” by appellants’ expert in his report. It is clear that |10Chateau Creole has suffered damage because of D.A. Exterminating’s failure to perform its contract beyond the repair costs awarded by the trial court. It is certainly plausible that Chateau Creole has suffered what it terms as a “stigma” to the property. Appellees liken the damages in this case to the measure of damages when a car has been wrecked, even if fully repaired, because of the uncertainty of structural damage. In those cases, the measure of damages when a car has been wrecked is cost of repairs plus the diminution in value. See Gary v. Allstate Insurance Company, 250 So.2d 168 (La.App. 1 Cir.1971) (wherein the court recognized the vehicle was difficult to sell because it had been wrecked, even though a state of excellent repair was achieved).
In the instant case, the total structural damage to the property is unknown. This unknown character of the property must, by law, be passed on to any purchaser. Although there is no formula which can be applied with exactitude in the assessment of the “stigma” attached to a property severely damaged by termites, this case, as with all others, must rest on its own facts and circumstances as supported by the record. The trial court accepted the testimony of witnesses who stated the property was devalued by at least 5%. The trial court did not accept appellee’s valuation of the property at $3.9 million, but provided his own value of $3 million and reduced that figure by 5% for the diminution in value of the property. We do not find this to be an abuse of discretion. Awarding appellees’ diminution in value, in addition to cost of repair, places them closer to the position they held prior to the damage.
For the foregoing reasons, we amend the judgment to reduce the award of the out-of-pocket expenses to $26,695.56. In all other respects, the judgment is affirmed. Costs of this appeal are assessed against the appellants.
AMENDED AND AFFIRMED AS AMENDED.