GUIDRY, J.
*1166 In this appeal, a lessor contests the trial court's failure to hold the lessee liable for all the damages claimed by the lessor. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
Cross Gates, Inc. is a Louisiana corporation that developed several properties in and around the city of Slidell, including a shopping center at the intersection of Gause Boulevard and Military Road. The first building in the shopping center was designed by and constructed for The Great Atlantic & Pacific Tea Company, Inc. (commonly referred to as simply "A & P"), which leased the building to be constructed for the operation of a supermarket.[1] Although the lease was executed in 1984, the initial twenty-year term of the lease would not commence until the earlier of the date on which A & P opened the store for business or sixty days after possession of the premises was delivered to A & P. According to a "Confirmation of Lease Term Agreement," executed by Cross Gates and A & P on June 20, 1986, the initial term of the lease commenced on May 8, 1986, and ended on May 31, 2006. The lease also provided for up to four renewal periods of five years each, with the first renewal period commencing on June 1, 2006, and ending on May 31, 2011.
During the initial term of the lease, Superfresh/Sav-A-Center, Inc., a subsidiary of A & P (collectively "A & P/Sav-A-Center"), took over the lease in the 1990s and renovated/rebranded the grocery store by changing the flooring and layout and added a kitchen and bakery. The lease was subsequently renewed for the first of the four renewal periods provided for in the lease. More than a year after renewing the lease, A & P/Sav-A-Center notified Cross Gates that it had assigned its interest in the renewed lease to Rouse's Enterprises, L.L.C., effective November 1, 2007. In addition to acquiring A & P/Sav-A-Center's interest in the Cross Gates lease, Rouse's also purchased all of the assets of the grocery store, excluding inventory.[2] Shortly after acquiring the lease, Rouse's closed the grocery store and removed fixtures and equipment from the store, which it either sold or incorporated into other stores.[3]
*1167 By a letter dated October 25, 2010, Rouse's notified Cross Gates that it did not intend to renew the assigned lease, which was due to expire on May 31, 2011. After the expiration of the lease, Cross Gates sued Rouse's, claiming that Rouse's had caused extensive damage to the leased premises after taking over the lease and alleging that Rouse's action were in breach of the lease and its obligations as a lessee. The matter eventually proceeded to a trial on the merits, at which Cross Gates sought to recover the following expenses that it had incurred in renovating and repairing the grocery store formerly leased to Rouse's:
Sheetrock and paint = $ 15,500.00 Replacement of ceiling tiles = $ 22,000.00 Replacement of flooring = $ 65,100.00 Replacement of HVAC system = $258,000.00 Replacement of light fixtures = $ 38,983.50[4] ___________ Total costs = $399,583.50
[Editor's Note: The preceding image contains the reference for footnote[4] ]
Following the trial and after considering post-trial briefing by the parties, the trial court rendered judgment rejecting Cross Gates' claims related to the HVAC system, the ceiling tiles, and replacement flooring, but awarded Cross Gates partial compensation related to the light fixtures, sheetrock, rusted metal studs,[5] and for repairing the concrete subfloor of the building. Accordingly, the trial court signed a judgment on November 20, 2017, in favor of Cross Gates and against Rouse's, in the amount of $14,040.00, plus legal interest. Cross Gates devolutively appeals that judgment.
ASSIGNMENTS OF ERROR
1. The trial court erred as a matter of law when it misinterpreted the lease agreement and failed to award any damages to Cross Gates for replacement of the HVAC system, where paragraph 12A of the lease specifies that Tenant [Rouses] is responsible for "repairs and replacements to the heating, ventilating and air conditioning [HVAC] systems located therein," and paragraph 12B, which addresses the Landlord's responsibility, excludes any mention of the HVAC system.
2. The trial court erred in failing to award replacement-cost damages for the light fixtures, ceiling tiles, and VCT flooring, instead awarding damages based on the actual current value of the light fixtures that had been removed, and awarding no damages for the ceiling tiles, which cost $22,000 to replace, and no damages for the replacement of the VCT flooring, other than $3,000 for repair to the gouges in the subfloor.
3. The trial court abused its discretion in awarding only $7,500 for the repair of molded sheetrock and the removal and replacement of rusted metal studs, and in refusing to *1168 award any damages for the interior painting that was required; the sheetrock, rusted metal studs, and paint cost Cross Gates $15,500.
DISCUSSION
HVAC System
In its first assignment of error, Cross Gates challenges the trial court's failure to award any compensation for the cost it incurred in replacing the HVAC system. The record reveals that shortly after acquiring the lease to the store, Rouse's discontinued the grocery store being operated on the premises and closed up the building. Upon closing the store, Rouse's stopped running the HVAC system in the building for the remainder of the term of the lease. Cross Gates claims that the HVAC system was rendered inoperable due to Rouse's failure to run the system for over three years.
According to La. C.C. art. 2683, among the principal obligations of the lessee is that the lessee use the thing leased as a prudent administrator and in accordance with the purpose for which it was leased and to return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered, except for normal wear and tear. If a lessee uses the thing in a manner that may cause damage to the thing, the lessor may obtain compensation for any damages he may have sustained. La. C.C. art. 2686. Moreover, the lessee is obligated to repair damage to the thing caused by his fault and to repair any deterioration resulting from his use to the extent it exceeds the normal or agreed use of the thing. La. C.C. arts. 2687 and 2692.[6]
Section 12 of the parties' lease, titled "Repairs," states that the tenant (in this case, Rouse's) is responsible for all necessary interior structural and non-structural repairs, including "to the heating, ventilating and air conditioning system located therein" as well as for repairs "required as a result of Tenant's negligence."[7] Section 24 of the lease, titled "End of Term," states that upon the expiration of the lease, the tenant must surrender the premises "in good order and condition, reasonable wear and tear ... excepted."
In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not.[8] Blake v. City of Port Allen, 14-0528, p. 9 (La. App. 1st Cir. 11/20/14), 167 So.3d 781, 788. A trial court's determination of whether a repair is due to abuse of the property by the tenant or due to normal wear and tear is a factual finding subject to review on appeal under the manifest error standard. See *1169 Kushi Healthcare, L.L.C. v. St. James Behavioral Health Hospital Inc., 15-0007, pp. 6-7 (La. App. 1st Cir. 6/5/15), 174 So.3d 1192, 1197 ; Cohn Realty Co., Inc. v. Well, 356 So.2d 514, 516 (La. App. 1st Cir. 1977). The determination to be made is whether the harm would have occurred but for the defendant's alleged substandard conduct, or, when concurrent causes are involved, whether the defendant's conduct was a substantial factor in bringing about the harm. Blake, 14-0528 at p. 10, 167 So.3d at 789.
Louis "Pat" Giles Miramon, Jr.[9] was the former president of Cross Gates, and he exercised management authority during the existence of the lease with A & P/Sav-A-Center and Rouse's. Mr. Miramon testified that the original HVAC system was installed in the store in 1984. He stated that when he installed the HVAC system,[10] he expected the HVAC system to last ten or twenty years.
Richard Mark Nunnelly testified as an expert witness in the field of HVAC systems. When asked what would happen when an HVAC system is not run for three years, Mr. Nunnelly testified regarding a number of things that could possibly happen, such as rust and corrosion of parts due to oil not being circulated through the system, causing the system to "seize up and be stuck." In such cases, Mr. Nunnelly testified that parts could be replaced so that the system would work, but to do so would require "a pretty thorough evaluation of the equipment to see what is working and what is not working." He said the cost to have a contractor go through the entire piece of equipment looking at every detail and every valve would probably take a couple of days and cost a few thousand dollars.
Mr. Nunnelly testified that in his experience, he had evaluated "a half a dozen or so" HVAC systems that had not been run for two or three years. In all of those cases, he said the recommendation was made to replace rather than repair the HVAC systems because:
[A]fter looking at the equipment ... oftentimes there are other things besides just the fact that it's not run for three years, if it is aged equipment, ... more than 15, 18 years, something like that, we are looking at the cost of that type of refrigerant, just looking at the cost of the equipment and replacements, usually it is best just to go ahead and replace the equipment.
He also explained that he recommended replacement for the six HVAC systems on which he consulted primarily because the units were "[t]oward the end of the life expectancy." He opined that "it just doesn't make sense to try to add the refrigerant into a system that is almost 20 years old." Mr. Nunnelly stated that he did not know whether the inoperable HVAC system did not work because it had been turned off or because it was seized up. He further admitted that he never inspected the inoperable HVAC system nor did he review the repair/maintenance history for the system.
Dolly Miramon, Mr. Miramon's daughter, was the assistant manager of Cross Gates and performed day-to-day management duties for Cross Gates beginning in 1993. When asked if she had any knowledge of whether the HVAC system could have been repaired, Ms. Miramon stated that the owner of Slidell Refrigeration told her it would be more costly to repair the *1170 system and advised her to replace the system. She admitted that she could not say whether any attempt had been made to evaluate what it would require to repair the system.
In Urban Management Corporation v. Ford Motor Credit Company, 263 So.2d 404, 409-10 (La. App. 2d Cir. 1972), the lessor claimed that the lessee's action of setting the thermostat too low caused damage to the air conditioning system for which the lessor sought to recover. The court rejected the lessor's claim, finding there was insufficient evidence of a causal relationship between the thermostat setting and the replacement of the compressor in the air conditioning system.
In the present case, the trial court found the 26-year-old HVAC system was well past its expected useful life and therefore Cross Gates was not entitled to recover the expense for replacing the HVAC system. While it is undisputed that Rouse's did not run the HVAC system for at least three years, the evidence presented at trial was inconclusive as to whether the HVAC system was inoperable due wholly or partly to the failure to operate the system or due merely to the age of the system. Based on the evidence before us, we cannot say that the trial court manifestly erred in finding that the HVAC system had to be replaced due to the age of the system rather than any negligence of Rouse's. Accordingly, we reject Cross Gates' first assignment of error.
In Cross Gates' second assignment of error, it challenges the trial court's award of only a portion of the damages claimed for light fixtures that were removed from the store and its failure to award any amount for the damage Rouse's caused to the ceiling tiles and to the VCT flooring in the store.
Light Fixtures
It is undisputed and the record clearly establishes that Rouse's removed 248 light fixtures from the grocery store. Robert Michael Bixenman, the maintenance and construction director for Rouse's until his retirement in March 2017, testified that the lights were removed in 2009, and used in one of the other Sav-A-Center stores acquired by Rouse's. At trial, two invoices from the lighting company Cross Gates hired to replace the light fixtures in the store were introduced. The first invoice was a cost quote for the installation of 250 8-foot light fixtures to replace the 248 light fixtures that were removed. The second invoice was a cost quote for the installation of 367 8-foot light fixtures, plus the cost of removing the remaining original light fixtures from the store. The original light fixtures in the store were 4-foot fixtures.
The proper goal of a damage award is to restore the plaintiff, as closely as possible, to the position that he would have occupied had the accident never occurred. Carter v. Gulf States Utilities Company, 454 So.2d 817, 820 (La. App. 1st Cir. 1984). There is no formula that can be applied with exactitude in the assessment of property damages. Each case must rest on its own facts and circumstances as supported by proof in the record. Where there is a legal right to recovery of damages, but the amount cannot be exactly determined, the courts have reasonable discretion to assess them based upon all the facts and circumstances of the particular case. Fortson v. Louisiana Power & Light Company, 509 So.2d 743, 745 (La. App. 3d Cir. 1987)
Generally, three approaches have been followed by Louisiana courts in arriving at the amount to award for damages to property: (1) the cost of restoration if the thing damaged can be adequately repaired; (2) the difference in value prior to and following the damage; or (3) the cost of *1171 replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of the repairs exceeds the value of the thing damaged. Carter, 454 So.2d at 820. On appellate review, damage awards will be disturbed only when there has been a clear abuse of the trier of fact's discretion. Blake, 14-0528 at p. 13, 167 So.3d at 791.
Ms. Miramon testified that Cross Gates was only seeking one-half of the $77,967.96 quoted in the second invoice because only half of the original lights were removed by Rouse's. When Ms. Miramon was asked why the decision was made to remove the remaining original light fixtures, she stated that the light fixtures were "a little bit outdated" from what she understood. She further indicated that the new lessee for the store had requested that 8-foot light fixtures be installed in the store instead of 4-foot fixtures. The lease with the new lessee contains a provision requiring Cross Gates to "replace lighting with new [8-foot] lighting throughout the sales floor."
Ms. Miramon admitted that she did not know how much it would cost to simply replace the 248 4-foot light fixtures that were removed by Rouse's. Mr. Bixenman, however, testified that the value of a light fixture that was 15 to 20 years old was anywhere from "nothing to $5.00." The trial court evidently used this amount for calculating its award of $1,240.00[11] for the light fixtures that were removed. The trial court also awarded Cross Gates an additional $2,300.00 as "the amount necessary to repair the wiring damaged by the removal of the fixtures." Considering the foregoing testimony and evidence presented at trial regarding the light fixtures, we cannot say that the amount awarded was an abuse of the trial court's discretion.
Ceiling Tiles
At trial, Ms. Miramon testified that because Rouse's never ran the air conditioning in the store during its tenure as lessee, "there was so much moisture in the store [that] it made all of the ceiling tiles cup all four sides." As she explained, due to the described warping of the ceiling tiles, the tiles would not sit in the metal frames and some of the tiles had even fallen from the ceiling. Mr. Miramon likewise testified that the failure to run the air conditioning in the store affected the ceiling tiles, causing them to become damp, mildew, and warp. As a result, he testified that the entire ceiling had to be replaced. Ms. Miramon identified an invoice from Brockhaus & Co., Inc., which charged $22,000.00 for labor and materials to replace the ceiling tiles and to patch the ceiling grid where needed. Mr. Bixenman, who opined that the useful life of a ceiling tile is about 20 years, acknowledged that there would be no need to replace ceiling tiles unless they are broken. He further acknowledged that while the ceiling tiles may be worth nothing if a person would try to resell them, they were worth something sitting in the store.
The trial court found that Rouse's failure to operate the HVAC system caused the ceiling tiles to warp, but because the ceiling tiles were "past their expected useful life," the trial court did not award Cross Gates any compensation for the ceiling tiles that it found that Rouse's had damaged. We find the trial court did not abuse its discretion in not compensating Cross Gates for the damaged ceiling tiles, as the evidence establishes that Cross Gates had no legal right to the recovery of *1172 damages for this claim. See Fortson, 509 So.2d at 745.
As held by this court in in Cenac v. Duplantis Moving & Storage Company, Inc., 407 So.2d 424, 426 (La. App. 1st Cir. 1981), where property is destroyed beyond repair and the market value is not ascertainable, the proper measure of damages is replacement cost less depreciation. The trial court accepted Mr. Bixenman's testimony that the useful life of the ceiling tiles was 20 years.[12] Thus, applying the replacement cost less depreciation test, and considering the age of the ceiling tiles as being past their useful life, the replacement costs incurred by Cross Gates would be reduced by a 100 percent depreciation factor, resulting in a recovery amount of zero dollars. Hence, under the applicable test for measuring this claim for damages, Cross Gates has no legal right of recovery.
VCT Flooring
When the store at issue was originally constructed, vinyl composite tile (VCT) flooring was placed throughout the store. Then, in the 1990s, when the store was renovated and rebranded as a Sav-A-Center, another layer of VCT flooring was placed on top of the original layer. In the course of removing fixtures and equipment after acquiring the lease to the store, Rouse's pulled up portions and gouged pieces out of the existing two layers of floor. As a result of this damage to the flooring, Cross Gates claims that it not only had to replace the flooring in the store, but it also had to remove the prior two layers of flooring and repair the concrete subfloor before installing the new flooring. Evidence of other defects in the existing flooring, not attributable to Rouse's, was also presented at trial, such as discoloration due to staining where cleaning products seeped under and built up under shelving in the store.
Despite acknowledging that the new lessee for the store required that the existing flooring be replaced with new VCT flooring in a color and pattern selected by the new lessee, Ms. Miramon nonetheless testified that: (1) the new flooring could have been installed over the existing flooring but for the damage caused by Rouse's; and (2) if the new lessee had so elected, which it did not, portions of the existing flooring could have remained in place with new, decorative tiles being added in certain locations throughout the store as needed or to fulfill the new lessee's color scheme and pattern.
Mr. Bixenman agreed that a third layer of VCT tile could possibly be added on top of two prior layers, if the first two layers are stable and well maintained. However, he also testified that normally two layers are the limit of VCT flooring that can be stacked on top of each other and that adding a third layer is not recommended and would not be warranted by most manufacturers. He also opined that properly maintained VCT flooring typically lasts at least 20 years.
Observing that section 12B of the lease obligated Cross Gates to repair and replace the flooring in the store and that the existing VCT flooring was faded in exposed areas, the trial court concluded that the existing flooring would have had to be removed in any event because of normal wear and tear. Although the record shows and the trial court found that Rouse's had damaged portions of the existing flooring, we nevertheless find that the trial court did not abuse its discretion in not awarding Cross Gates the costs associated with removing the existing flooring and replacing it with new VCT flooring.
*1173 First, we observe that even if the existing flooring had not been damaged by Rouse's, allowing Cross Gates to install a third layer of flooring on top of the existing two layers of flooring, Cross Gates would have still had to incur the expense of the new flooring. The lease with the new lessee required the installation of new VCT flooring in a color and pattern selected by the new lessee. Additionally, while Ms. Miramon speculated that instead of having to buy all new flooring, decorative tiles could have been added throughout the store to suit the new lessee, Cross Gates presented no evidence to suggest that such an option was considered by or would be acceptable to the new lessee.[13] Hence, Cross Gates' claim for the cost of the new flooring was properly rejected by the trial court.
Further, while it is undisputed that the damage to the existing flooring caused by Rouse's precluded Cross Gates from simply adding a third layer of flooring on top of the existing flooring, we can find no basis for discrediting Mr. Bixenman's testimony advising against the utility of such action. Hence, the evidence that it would not be prudent to add a third layer of VCT flooring on top of the two existing layers, combined with the fact that Cross Gates was obligated to install new VCT flooring for the new lessee, supports the trial court's rejection of Cross Gates' claim for the costs of removing the existing flooring.
Painting
In its final assignment of error, Cross Gates contests the trial court's failure to award any costs for painting; however, based on the evidence in the record before us, we cannot say that the trial court abused its discretion in not awarding Cross Gates any damages for painting.
Special damages are those that have a "ready market value," such that the amount of damages theoretically may be determined with relative certainty. Guillory v. Lee, 09-0075, p. 16 (La. 6/26/09), 16 So.3d 1104, 1117. A trial court is given great discretion in its assessment of quantum for special damages. Tate v. Kenny, 14-0265, p. 8 (La. App. 1st Cir. 12/23/15), 186 So.3d 119, 127. A reviewing court should not set aside an award of special damages unless an analysis of the facts and circumstances reveals an abuse of discretion in setting the award. Banks v. First Guaranty Bank of Hammond, 13-0607, p. 21 (La. App. 1st Cir. 2/25/14), 2014 WL 766846, at *11. The plaintiff bears the burden of proving with legal certainty every item of damages, but a plaintiff's own uncorroborated "personal estimate" of loss is insufficient to satisfy that burden. Blake, 14-0528 at p. 15, 167 So.3d at 792.
Ms. Miramon testified that D Management, a company she owns, performed the repairs to the sheetrock and metal studs and did the painting work for which Cross Gates was seeking $15,500.00 in compensation. She stated that $7,500.00 of that amount was for the sheetrock and metal studs, and $8,000.00 was for painting. The trial court only awarded Cross Gates the $7,500.00 for the sheetrock and metal studs.
The invoice submitted in support of the painting expense shows that the amount charged was for painting inside and outside of the building; however, Ms. Miramon could not say how much of the $8,000.00 charged was for "outside painting."
*1174 When questioned about whether Rouse's was responsible for outside painting, Ms. Miramon responded that it was assumed that Rouse's would accept responsibility, although the assumption was never communicated to Rouse's. She also admitted that the paint color used was picked by the new lessee of the building. With regard to the need for painting, Mr. Bixenman testified that "[s]tores are never painted unless we are going through a remodel[,]" because, as he explained, a remodel encompasses a whole new scheme or décor package, and everything has to match.
Ms. Miramon testified that although she had evidence of the separate material and labor costs that supported the $15,500.00 invoiced amount, she said it was her "error" in not providing that evidence. She admitted that she did not prepare the $15,500.00 invoice contemporaneously with the work that was performed. As she explained, the invoice was put "together when we put the lawsuit together to say we should get our damages back."
In general, under the lease, Cross Gates bore responsibility for making all repairs and replacements to the exterior of the leased premises that were not required to be made by Rouse's. Section 12E of the lease states that Cross Gates "shall maintain the exterior of all buildings and other structures in the Shopping Center in good order and condition, which shall include repainting when necessary." Hence, the record establishes no grounds for holding Rouse's liable for the expense of painting the exterior of the leased premises.
Moreover, while Ms. Miramon did submit an invoice from D Management for the painting work performed, she admitted that she prepared the invoice for the purposes of the lawsuit. Additionally, the evidence presented at trial cast doubt on whether the painting was done as a consequence of any damage caused by Rouse's or whether it was done to suit the design scheme of the new lessee. Cf. Tudor Chateau Creole Apartments Partnership v. D.A. Exterminating Co., Inc., 96-0951, pp. 7-8 (La. App. 1st Cir. 2/14/97), 691 So.2d 1259, 1264 (where the court rejected expenses claimed by the plaintiff that had no supporting evidence, but accepted the expenses for which there were supporting invoices in light of the fact that the defendants presented no evidence that the repairs were not done for the purpose of repairing the damage caused by the defendants or that the repairs were not billed as represented in the invoices).[14] Thus, considering the evidence presented, we cannot say that the failure to award Cross Gates damages for painting was an abuse of the trial court's discretion.
CONCLUSION
Based on the foregoing review of the record and consideration of the issues presented, with appropriate deference being accorded to the trial court, we affirm. All costs of this appeal are cast to the appellant, Cross Gates, Inc.
AFFIRMED.

While A & P operated a grocery store out of the leased premises, the lease also allowed for the premises to be used and occupied for "any other lawful retail purpose or purposes except for the sale of prescription drugs."

The September 14, 2007 Asset Purchase Agreement executed by A & P/Sav-A-Center and Rouse's identifies "inventory" as "foods, beverages and other products sold in such Premises [being "the physical space leased by" A & P/Sav-A-Center] that are saleable to retail customers in the Ordinary Course of Business located in such Premises, and all goods, wares, merchandise, packaging materials, paper bags and polyfilm ... located in such Premises."

When Rouse's obtained the lease on the subject store, it also acquired the leases for several other A & P/Sav-A-Center stores in the New Orleans market. Of the leases acquired, there were two stores that Rouse's planned not to operate because it believed the stores would not be profitable in the market where they were located. Consequently, for those two stores, Rouse's arranged to have A & P/Sav-A-Center close the store beforehand by selling down the inventory and discontinuing to make future purchases. The store leased by Cross Gates was one of the two stores that Rouse's decided not to continue to operate.

While Cross Gates initially demanded $77,967.00 as the cost for replacing the light fixtures in the leased premises, at trial, it reduced the demand to half of that cost.

Based on pictures introduced at trial, the "metal studs" appear to be portions of the metal framing used to construct the building.

See also comment (c) to Article 2692.

It was established at trial that the units of the HVAC system that were replaced were actually located on the roof of the building. Section 12B of the lease states that the lessor is responsible for all repairs and replacements to the exterior, floor and roof of the building.

A fact established by direct evidence is one that has been testified to by witnesses as having come under the cognizance of their senses. Circumstantial evidence, on the other hand, is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred. Blake v. City of Port Allen, 14-0528, p. 9 (La. App. 1st Cir. 11/20/14), 167 So.3d 781, 788.

A certified copy of the deposition of Mr. Miramon was introduced into evidence at the trial due to the death of Mr. Miramon prior to trial. Mr. Miramon was deposed as the corporate representative of Cross Gates.

In addition to being president of Cross Gates, Mr. Miramon also owned Miramon Construction, which built the store as well as other buildings in the shopping center.

$5.00 x 248 = $1,240.00

Mr. Miramon, however, was of the opinion that a "ceiling normally lasts forever."

Notably, the removal of the existing 4-foot light fixtures remaining in the store to replace them with 8-foot light fixtures was made at the insistence of the new lessee. Thus, the expense for the removal and replacement of the remaining 4-foot fixtures was incurred because of the new lessee.

In addition to the $15,500.00 invoice from D Management, copies of several checks from Cross Gates that were written to D Management for varying amounts were introduced. The sum of the checks did not match up with the $15,500.00 amount shown on the invoice from D Management. Ms. Miramon explained that the checks "were just draws" and that they covered other repair work performed by D Management on the building for which Rouse's was not charged.